**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| ALAN CAMPBELL, derivatively on behalf of RYDER SYSTEM, INC., | |
| Plaintiff, | Case No. _____ |
| vs. | |
| ROBERT E. SANCHEZ, ART A. GARCIA, DENNIS C. COOKE, JOHN M. BERRA, ROBERT J. ECK, ROBERT A. HAGEMANN, L. PATRICK HASSEY, MICHAEL F. HILTON, TAMARA L. LUNDGREN, LUIS P. NIETO, JR., DAVID G. NORD, ABBIE J. SMITH, E. FOLLIN SMITH, DMITRI L. STOCKTON, and HANSEL E. TOOKES, II, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| RYDER SYSTEM, INC., | |
| Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

Plaintiff Alan Campbell ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Ryder System, Inc. ("Ryder" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Robert E. Sanchez, Art A. Garcia, Dennis C. Cooke, John M. Berra, Robert J. Eck, Robert A. Hagemann, L. Patrick Hassey, Michael F. Hilton, Tamara L. Lundgren, Luis P. Nieto, Jr., David G. Nord, Abbie J. Smith, E. Follin Smith, Dmitri L. Stockton, and Hansel E. Tookes, II (collectively, the "Individual Defendants," and together with Ryder, the "Defendants") for breaches of their fiduciary duties as

directors and/or officers of Ryder, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ryder, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Ryder's directors and/or officers starting on July 23, 2015 and continuing through February 13, 2020 (the "Relevant Period").

2.      Ryder is a global provider of transportation and supply chain management solutions and operates its business through three main segments: (i) Fleet Management Solutions ("FMS"); (ii) Dedicated Transportation Solutions ("DTS"); and (iii) Supply Chain Solutions ("SCS").

3.      The FMS segment provides full-service leasing and leasing with flexible maintenance options, shorter-term commercial truck rental, and contract or transactional maintenance services of trucks, tractors, and trailers. As the Company has the largest commercial

2

vehicle fleet in North America, the FMS segment is a critical aspect of the Company's overall business as it currently accounts for approximately 60% of Ryder's revenue.

4.      Ryder's FMS segment's financial performance is dependent on demand for truck rentals and leases, as well as demand for the used trucks once their useful life is over.

5.      Most of the Company's assets are tied up in its fleet of commercial trucks and tractors, i.e., the Company's "revenue-earning equipment." As a result, the valuation of the Company's revenue-earning equipment, like its trucks, was critical to the Company's finances.

6.      The Company was required to report the value its revenue-earning equipment according to Generally Accepted Accounting Principles ("GAAP"). Pursuant to GAAP, the Company was required to recognize expenses associated with its revenue-earning equipment in the same reporting periods that revenue generated by such equipment was recognized. For example, one such expense was depreciation (which is simply the reduction in the asset's value over time).

7.      The Company calculated depreciation as the difference between the vehicle's cost and its residual value (the value at which Ryder would be able to sell the used vehicle at the end of its useful life). Thus, the higher the residual value, the less depreciation a company needs to recognize because of that asset's retained value. Since the Company has a lot of assets, namely its vehicles, depreciation is a major expense. Therefore, the residual value of the Company's revenue-earning equipment is a vital consideration and has a huge impact on the Company's financial results.

8.      However, as discussed in detail below, throughout the Relevant Period, the Individual Defendants caused the Company to engage in improper accounting practices by

overstating the residual value of its trucking fleet, which allowed the Company to record lower depreciation expenses on those assets for years, and, in turn, artificially inflate the Company's earnings and misrepresent the Company's true financial position.

9.      Moreover, residual values of Ryder's vehicles were critical to other aspects of Ryder's business, including the price of the lease that Ryder offered to consumers. Each month of the lease, the Ryder customer pays a portion of the vehicle's depreciation expense. Therefore, if Ryder were to increase the residual value of its vehicles, the amount of deprecation on those vehicles would decline, which would lower the monthly payments customers make pursuant to the lease and make the Company's lease pricing more competitive in the market. Consequently, by inflating the residual values of their vehicles, and understating its depreciation expense, Ryder not only artificially inflated its earnings, but the Company also artificially drove its leasing business throughout the Relevant Period.

10.     In fact, between 2011 and 2016, Ryder adjusted the residual values of certain assets upwards between $10 million and $40 million, allowing Ryder to decrease the incremental depreciation charge the Company recorded on these assets each year, which boosted Ryder's earnings.

11.     But, starting in mid-2015, the Company should have adjusted the residual values of its vehicles downward. As admitted to by the Company's CEO, Defendant Sanchez (defined below), the market for Ryder's used vehicles started plummeting around then and the number of the Company's used vehicles for sale increased greatly between 2015 and 2016. Despite the drop in used vehicle prices, the Company did not reduce residual values on its trucks (as it should have),

causing the Company to improperly overstate its earnings by hundreds of millions of dollars during the Relevant Period.

12. As explained more fully below, the Individual Defendants knew, at least by mid-2015, that a drastic reduction in residual values on Company vehicles was necessary but nonetheless caused the Company to fail to make the proper adjustments to its financial reporting—in particular to its vehicles' residual values—in an attempt to artificially inflate the Company's earnings and performance.

13. The truth began to gradually emerge on July 30, 2019, when Ryder reduced its full-year 2019 guidance and indicated that the lower earnings projection reflected the Company's weaker valuation of its tractors. Then, on October 29, 2019, Ryder announced that it was reducing the residual value estimates and management finally admitted that the Company's "residual value estimates likely exceeded the expected future values that would be realized upon the sale of power vehicles in our fleet." Ryder incurred an additional $177 million in depreciation expenses for the third quarter of 2019 and announced a reduction in its residual value estimated for the second half of 2019 by $289 million. Moreover, the Company reduced its residual value estimates moving forward through 2024-2025 by $844 million.

14. Then, in a February 13, 2020 Press Release, Ryder finally disclosed that the full financial impact of its reduced residual value estimates was more than $1 billion. In response to this disclosure, the Company's stock price fell dramatically by over 23% over three trading days, from a closing price of $50.19 per share on February 12, 2020 to a closing price of $38.34 per share on February 18, 2020.

15.     Although the Company claimed that the adjustment was due to an unexpected and unpredictable decline in used vehicle prices starting in the second half of 2019, it is clear that the Individual Defendants were aware of, or recklessly disregarded, a sharp and prolonged downturn in the market for used vehicles starting in mid-2015 and continuing throughout the Relevant Period and, thus, should have reduced the residual value of the Company's assets much earlier than they did.

16.     Instead, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to engage in improper accounting practices, and by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) throughout the Relevant Period, nearly all of Ryder's used vehicles were selling at prices significantly below the residual values that the Company had designated for each vehicle; (2) as a result, Ryder had a large number of vehicles that were recorded at high residual values that needed to be written down because the residual values of the Company's used vehicles had materially decreased and its depreciation expense had materially increased beginning at least as early as mid-2015; (3) the Company failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense, which resulted in a material overstatement of the Company's net earnings, earnings per share, the value of its operating property and equipment, its total assets, retained earnings, and total shareholder's equity; (4) the Company failed to maintain

internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

17.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

18.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain internal controls.

19.     As a result of the foregoing, the Individual Defendants' and Company's public statements were materially false and misleading at all relevant times.

20.     Furthermore, during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, the Individual Defendants caused the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while six of them engaged in lucrative insider sales, netting combined proceeds of over $11.5 million. Approximately 3.1 million of the Company's equity securities were repurchased during the Relevant Period for over $201.3 million. As the Company's stock was actually only worth $38.45 per share during that time, the Company overpaid approximately $83 million in total.

21.     In light of the Individual Defendants' misconduct, which has subjected Ryder, its CEO, its former CFO, and its former President of the FMS Solutions segment to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of Florida (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial

reporting, and the losses from the waste of corporate assets, the Company will have to expend many millions of dollars.

22.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, eleven of whom are the Company's current directors, their collective engagement in the fraud, the substantial likelihood of the directors' liability in this derivative action and of two of them in the related Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested or independent directors, a majority of the Ryder's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) and 78t-1, and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

24.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

25.     This derivative action is not a collusive action designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

26.     Additionally, this Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a)(l) because complete diversity exists between the Plaintiff and each of the Defendants, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

27.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated and/or conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Florida or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

28.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

29.     Venue is proper in this District because Ryder and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

30.     Plaintiff is a current shareholder of Ryder common stock. Plaintiff has continuously held Ryder common stock at all relevant times. Plaintiff is citizen of the State of Michigan.

### Nominal Defendant Ryder

31.     Nominal Defendant Ryder is a Florida corporation with corporate headquarters at 11690 N.W. 105th Street, Miami, Florida 33178. Ryder's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "R."

**Defendant Sanchez**

32.     Defendant Robert E. Sanchez ("Sanchez") has served as Ryder's President and Chief Executive Officer since January 2013 and as a Company director and Chairman of Ryder's Board since May 2013. According to the 2020 Proxy Statement, as of February 28, 2020, Defendant Sanchez beneficially owned 718,409 shares of the Company's common stock, which represented 1.3% of the Company's outstanding shares of common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on February 28, 2020 was $38.04, Defendant Sanchez owned over $27.3 million worth of Ryder stock.

33.     For the fiscal year ended December 31, 2015, Defendant Sanchez received $5,640,937 in compensation from the Company. This included $768,825 in salary, $1,628,493 in stock awards, $1,539,956 in option awards, $1,520,137 in non-equity incentive plan compensation, and $183,526 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Sanchez received $5,105,686 in compensation from the Company. This included $785,225 in salary, $1,351,441 in stock awards, $1,539,987 in option awards, $1,207,635 in non-equity incentive plan compensation, $65,069 in pension value and nonqualified deferred compensation earnings, and $156,329 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Sanchez received $6,137,757 in compensation from the Company. This included $804,000 in salary, $2,140,487 in stock awards, $1,640,009 in option awards, $1,309,625 in non-equity incentive plan compensation, $101,879 in pension value and nonqualified deferred compensation earnings, and $141,757 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Sanchez received $7,393,876 in compensation from the Company. This included $820,080 in salary, $3,558,155 in stock awards, $1,230,369 in option awards,

10

$1,595,259 in non-equity incentive plan compensation, and $190,013 in all other compensation. For the fiscal year ended December 31, 2019, Defendant Sanchez received $6,604,851 in compensation from the Company. This included $870,468 in salary, $3,897,431 in stock awards, $860,002 in option awards, $501,247 in non-equity incentive plan compensation, $196,915 in pension value and nonqualified deferred compensation earnings, and $278,788 in all other compensation.

34.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Sanchez made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| May 24, 2016 | 37,550 | $68.05 | $2,555,277.50 |
| August 4, 2017 | 26,275 | $72.43 | $1,903,098.25 |
| August 7, 2018 | 27,830 | $78.04 | $2,171,853.20 |

Thus, in total, before the fraud was exposed, Defendant Sanchez sold 91,655 Company shares on inside information, for which he received over $6.6 million. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

35.     The Company's 2020 Proxy Statement stated the following about Defendant Sanchez:

Mr. Sanchez currently serves as Chair and Chief Executive Officer of Ryder System, Inc.

Mr. Sanchez was appointed Chair of Ryder's Board in May 2013. He was appointed President and Chief Executive Officer in January 2013, at which time he was also elected to Ryder's Board. Mr. Sanchez joined Ryder in 1993 and has served in

positions of increasing responsibility, including a broad range of leadership positions in Ryder's business segments. Mr. Sanchez served as President and Chief Operating Officer from February 2012 to December 2012. Prior to that position, he served as President of Global Fleet Management Solutions, Ryder's largest business segment, from September 2010 to February 2012. Mr. Sanchez also served as Executive Vice President and Chief Financial Officer from October 2007 to September 2010; as Executive Vice President of Operations, U.S. Fleet Management Solutions from October 2005 to October 2007; and as Senior Vice President and Chief Information Officer from January 2003 to October 2005. Mr. Sanchez has been a member of Ryder's Executive Leadership team since 2003.

The Board nominated Mr. Sanchez as a director because of his leadership experience and expertise in transportation, supply chains/logistics, global operations, finance and information technology, which the Board finds to be valuable skills that complement the other skills represented on our Board. He has leadership experience based on years of broad-based, diverse senior management experience at Ryder, including serving as President and Chief Operating Officer, Division President of Ryder's largest business segment, Chief Financial Officer and Chief Information Officer. He also has experience as a director on a global public company board, including serving as compensation committee chair.

Consistent with our policies and practices related to director service, in making a determination as to Mr. Sanchez's nomination, the Board considered Mr. Sanchez's current role as CEO of Ryder and service on the board of another public company. Mr. Sanchez was renominated based on his qualifications listed above, his valuable, significant contributions to the Board and Company and his demonstrated willingness and ability to commit adequate time and attention to all Board matters.

36.     Upon information and belief, Defendant Sanchez is a citizen of Florida.

**Defendant Garcia**

37.     Defendant Art A. Garcia ("Garcia") served as Executive Vice President and Chief Financial Officer of Ryder from December 2010 until April 5, 2019, and then served as a Special Advisor to the CEO until April 30, 2019. According to the 2020 Proxy Statement, as of April 5, 2019, Defendant Garcia beneficially owned 134,752 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 5, 2019 was $64.73, Defendant Garcia owned approximately $8.7 million worth of Ryder stock.

38.     For the fiscal year ended December 31, 2015, Defendant Garcia received $1,678,684 in compensation from the Company. This included $440,800 in salary, $372,679 in stock awards, $359,954 in option awards, $424,426 in non-equity incentive plan compensation, and $80,825 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Garcia received $1,680,694 in compensation from the Company. This included $479,783 in salary, $337,208 in stock awards, $392,027 in option awards, $351,234 in non-equity incentive plan compensation, $42,095 in pension value and nonqualified deferred compensation earnings, and $78,347 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Garcia received $2,117,220 in compensation from the Company. This included $492,500 in salary, $601,366 in stock awards, $480,031 in option awards, $410,686 in non-equity incentive plan compensation, $62,842 in pension value and nonqualified deferred compensation earnings, and $69,795 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Garcia received $2,483,295 in compensation from the Company. This included $500,000 in salary, $1,028,202 in stock awards, $360,113 in option awards, $509,282 in non-equity incentive plan compensation, and $85,698 in all other compensation. For the fiscal year ended December 31, 2019, Defendant Garcia received $1,877,049 in compensation from the Company. This included $166,667 in salary, $90,876 in stock awards, $115,698 in pension value and nonqualified deferred compensation earnings, and $1,503,808 in all other compensation.

39.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Garcia made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| February 19, 2016 | 2,000 | $56.38 | $112,760.00 |
| February 15, 2017 | 2,205 | $78.83 | $173,820.15 |
| July 30, 2018 | 3,412 | $76.82 | $262,109.84 |

Thus, in total, before the fraud was exposed, Defendant Garcia sold 7,617 Company shares on inside information, for which he received $548,689. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

40.     The Company's 2018 10-K stated the following about Defendant Garcia:

Art A. Garcia has served as Executive Vice President and Chief Financial Officer since September 2010. Previously, Mr. Garcia served as Senior Vice President and Controller from October 2005 to August 2010, and as Vice President and Controller from February 2002 to September 2005. Mr. Garcia joined Ryder in 1997 and has held various other positions within Corporate Accounting.

41.     Upon information and belief, Defendant Garcia is a citizen of Florida.

**Defendant Cooke**

42.     Defendant Dennis C. Cooke ("Cooke") served as President of Ryder's Global FMS segment from February 2012 until August 29, 2019 and remained with the Company until November 30, 2019. Prior to that, Defendant Cooke had served as Senior Vice President and Chief of Operations for Ryder's FMS segment in the United States and Canada since 2011. According to the Company's 2020 Proxy Statement, as of November 30, 2019, Defendant Cooke beneficially owned 100,634 shares of the Company's common stock. Given that the price per share of the

14

Company's common stock at the close of trading on November 29, 2019[1] was $52.49, Defendant

Cooke owned approximately $5.3 million worth of Ryder stock.

43.     For the fiscal year ended December 31, 2015, Defendant Cooke received

$2,053,554 in compensation from the Company. This included $533,050 in salary, $424,134 in

stock awards, $400,010 in options awards, $600,559 in non-equity incentive plan compensation,

and $95,801 in all other compensation. For the fiscal year ended December 31, 2016, Defendant

Cooke received $1,843,686 in compensation from the Company. This included $543,750 in salary,

$353,692 in stock awards, $399,982 in options awards, $456,462 in non-equity incentive plan

compensation, and $89,800 in all other compensation. For the fiscal year ended December 31,

2017, Defendant Cooke received $2,399,477 in compensation from the Company. This included

$555,000 in salary, $666,620 in stock awards, $539,966 in options awards, $558,692 in non-equity

incentive plan compensation, and $79,199 in all other compensation. For the fiscal year ended

December 31, 2018, Defendant Cooke received $2,925,059 in compensation from the Company.

This included $566,825 in salary, $1,147,463 in stock awards, $405,127 in options awards,

$708,217 in non-equity incentive plan compensation, and $97,427 in all other compensation. For

the fiscal year ended December 31, 2019, Defendant Cooke received $4,214,364 in compensation

from the Company. This included $527,358 in salary, $1,228,413 in stock awards, $270,002 in

options awards, and $2,188,591 in all other compensation.

---

[1] Since the Company's 2020 Proxy Statement reflects Defendant Cooke's beneficial ownership as of November 30, 2019, a Saturday, Plaintiff uses the closing price from the day before, Friday, November 29, 2019, to determine the value of Defendant Cooke's ownership of Ryder stock.

44.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Cooke made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| November 14, 2016 | 6,000 | $79.27 | $475,620.00 |
| July 31, 2017 | 9,650 | $72.75 | $702,037.50 |
| October 31, 2017 | 32,328 | $81.46 | $2,633,438.88 |

Thus, in total, before the fraud was exposed, Defendant Garcia sold 47,978 Company shares on inside information, for which he received over $3.8 million. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

45.     The Company's 2018 10-K stated the following about Defendant Cooke:

Dennis C. Cooke has served as President, Global Fleet Management Solutions since February 2012. Previously, Mr. Cooke served as Senior Vice President and Chief of Operations, U.S. and Canada Fleet Management Solutions from July 2011 to February 2012. Prior to joining Ryder in July 2011, Mr. Cooke held various positions with General Electric (GE) and related companies, including Vice President and General Manager of GE Healthcare's Global MRI business from 2000 to 2005. He then served as President and Chief Executive Officer of GE Security's Homeland Protection business from 2005 to 2009, and continued serving in those roles from 2009 to 2011 after the business was acquired by the Safran Group and became Morpho Detection, Inc.

46.     Upon information and belief, Defendant Cooke is a citizen of Florida.

**Defendant Berra**

47.     Defendant John M. Berra ("Berra") served as a Company director from July 2003 until May 3, 2019. He served as a member of the Compensation Committee and as a member of the Finance Committee.

16

48.     For the fiscal year ended December 31, 2015, Defendant Berra received $248,309 in compensation from the Company. This included $101,000 in fees earned or paid in cash, $137,309 in stock awards, and $10,000 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Berra received $283,760 in compensation from the Company. This included $100,000 in fees earned or paid in cash, $173,760 in stock awards, and $10,000 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Berra received $279,456 in compensation from the Company. This included $100,000 in fees earned or paid in cash and $179,456 in stock awards. For the fiscal year ended December 31, 2018, Defendant Berra received $289,624 in compensation from the Company. This included $100,000 in fees earned or paid in cash, $179,624 in stock awards, and $10,000 in all other compensation. For the fiscal year ended December 31, 2019, Defendant Berra received $128,379 in compensation from the Company. This included $82,562 in fees earned or paid in cash, $35,817 in stock awards, and $10,000 in all other compensation.

49.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Berra made the following sale of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| May 8, 2018 | 1,990 | $68.33 | $135,976.70 |

50.     His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

51.     The Company's 2018 Proxy Statement (defined below) stated the following about

Berra:

> Mr. Berra served as Chairman of Emerson Process Management, a global leader in providing solutions to customers in process control, and Executive Vice President of Emerson Electric Company, until he retired in October 2010.
>
> Prior to October 2008, Mr. Berra served as President of Emerson Process Management. He joined Emerson's Rosemount division as a marketing manager in 1976 and continued assuming more prominent roles in the organization until 1997 when he was named President of Emerson's Fisher-Rosemount division (now Emerson Process Management). Prior to joining Emerson, Mr. Berra was an instrument and electrical engineer with Monsanto Company.
>
> The Board nominated Mr. Berra as a director because of his leadership experience and expertise in global marketing, operations and technology/engineering, which the Board finds to be valuable skills that complement the other skills represented on our Board. In addition, Mr. Berra has leadership experience in positions of executive oversight and senior management in a global public company with a diversified business. He also has experience as a director on a global public company board, including serving on audit,
> compensation and governance committees.
>
> Consistent with our policies and practices related to director service, in making a determination as to Mr. Berra's nomination, the Board considered Mr. Berra's current service on the board of another public company. Mr. Berra was renominated based on his qualifications listed above, his valuable, significant contributions to the Board and Company and his demonstrated willingness and ability to commit adequate time and attention to all Board matters.

52.     Upon information and belief, Defendant Berra is a citizen of Texas.

**<u>Defendant Eck</u>**

53.     Defendant Robert J. Eck ("Eck") has served as a Company director since March

2007. He also serves as a member of the Compensation Committee and as a member of the

Corporate Governance and Nominating Committee. Previously, he served as a member of the

Finance Committee. Additionally, Defendant Eck has also served as the Company's Lead

Independent Director. According to the 2020 Proxy Statement, as of February 28, 2020, Defendant

Eck beneficially owned 19,715 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2020 was $38.04, Defendant Eck owned approximately $749,959 worth of Ryder stock.

54. For the fiscal year ended December 31, 2015, Defendant Eck received $229,975 in compensation from the Company. This included $101,000 in fees earned or paid in cash, $118,975 in stock awards and $10,000 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Eck received $252,951 in compensation from the Company. This included $100,000 in fees earned or paid in cash, $142,951 in stock awards and $10,000 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Eck received $257,566 in compensation from the Company. This included $100,000 in fees earned or paid in cash, $147,566 in stock awards and $10,000 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Eck received $266,358 in compensation from the Company. This included $100,000 in fees earned or paid in cash, $156,358 in stock awards and $10,000 in all other compensation. For the fiscal year ended December 31, 2019, Defendant Eck received $219,741 in compensation from the Company. This included $100,000 in fees earned or paid in cash, $181,741 in stock awards and $10,000 in all other compensation.

55. The Company's 2020 Proxy Statement stated the following about Eck:

Mr. Eck served as Chief Executive Officer of Anixter International, Inc. (Anixter), a global distributor of network and security solutions, electrical and electronic solutions, and utility power solutions, from 2008 until he retired in 2018. He serves on Anixter's Board of Directors.

Mr. Eck joined Anixter in 1989 and held roles of increasing responsibility in strategy, supply chain management, sales and marketing, and human resources. From 2007 to 2008, Mr. Eck served as Executive Vice President and Chief Operating Officer of Anixter. Prior to that position, Mr. Eck served as Executive Vice President of Enterprise Cabling and Security Solutions for Anixter from 2004

to 2007. In 2003, he served as Senior Vice President of Physical Security Products and Integrated Supply of Anixter Inc.

The Board nominated Mr. Eck as a director because of his leadership experience and expertise in supply chain management, domestic and international operations, and marketing and business development, which the Board finds to be valuable skills that complement the other skills represented on our Board. In addition, Mr. Eck has prior leadership experience as President and Chief Executive Officer of a global public company. He also has experience as a director on a global public company board.

Consistent with our policies and practices related to director service, in making a determination as to Mr. Eck's nomination, the Board considered Mr. Eck's qualifications listed above, his valuable, significant contributions to the Board and Company and his demonstrated willingness and ability to commit adequate time and attention to all Board matters.

56.     Upon information and belief, Defendant Eck is a citizen of Illinois.

**Defendant Hassey**

57.     Defendant L. Patrick Hassey ("Hassey") served as a Company director from December 2005 to February 2018. Defendant Hassey also served as the Chair of the Compensation Committee and as a member of the Corporate Governance and Nominating Committee.

58.     For the fiscal year ended December 31, 2015, Defendant Hassey received $247,842 in compensation from the Company. This included $115,000 in fees earned or paid in cash and $132,842 in stock awards. For the fiscal year ended December 31, 2016, Defendant Hassey received $272,020 in compensation from the Company. This included in $106,000 fees earned or paid in cash and $166,020 stock awards. For the fiscal year ended December 31, 2017, Defendant Hassey received $271,463 in compensation from the Company. This included $100,000 in fees earned or paid in cash and $171,463 in stock awards.

59.     The Company's 2017 Proxy Statement stated the following about Defendant Hassey:

Served as Chairman and Chief Executive Officer of Allegheny Technologies Incorporated (ATI), a global leader in the production of specialty materials until he retired in May 2011.

Mr. Hassey also served as President of ATI until August 2010. He became Chairman in 2004 and President and Chief Executive Officer in 2003. Mr. Hassey served as an outside management consultant to ATI executive management. Before joining ATI, Mr. Hassey served as Executive Vice President and member of the corporate executive committee of Alcoa, Inc. from May 2000 until his early retirement in February 2003. He served as Executive Vice President of Alcoa and Group President of Alcoa Industrial Components from May 2000 to October 2002. Prior to May 2000 to October 2002. Prior to May 2000, Mr. Hassey served as Executive Vice President of Alcoa and President of Alcoa Europe, Inc.

The Board nominated Mr. Hassey as a director because of his leadership experience and expertise in global operations and oversight of large and diverse business units, which the Board finds to be valuable skills that complement the other skills represented on our Board. In addition, Mr. Hassey has leadership experience as President and Chief Executive Officer of a global public company. He also has experience as a director on global public company boards, including serving as board chair and member of audit and compensation committees.

Consistent with our policies and practices related to director service, in making a determination as to Mr. Hassey's nomination, the Board considered Mr. Hassey's current service on the board of another public company. Mr. Hassey was renominated based on his qualifications listed above, his valuable, significant contributions to the Board and Company and his demonstrated willingness and ability to commit adequate time and attention to all Board matters.

60.     Upon information and belief, Defendant Hassey is a citizen of Utah.

**Defendant Hagemann**

61.     Defendant Robert A. Hagemann ("Hagemann") has served as a Company director since August 2014. Defendant Hagemann has also served as a member and as the Chair of the Board's Audit Committee and as a member of the Finance Committee. According to the 2020 Proxy Statement, as of February 28, 2020, Defendant Hagemann beneficially owned 13,670 shares of the Company's common stock. Given that the price per share of the Company's common stock

at the close of trading on February 28, 2020, was $38.04, Defendant Hagemann owned approximately $520,007 worth of Ryder stock.

62.     For the fiscal year ended December 31, 2015, Defendant Hageman received $219,357 in compensation from the Company. This included $107,750 in fees earned or paid in cash and $111,607 in stock awards. For the fiscal year ended December 31, 2016, Defendant Hagemann received $248,689 in compensation from the Company. This included in $116,000 fees earned or paid in cash, $130,689 stock awards, and $2,000 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Hagemann received $257,680 in compensation from the Company. This included $121,000 in fees earned or paid in cash, $134,680 in stock awards, and $2,000 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Hagemann received $269,039 in compensation from the Company. This included $121,000 in fees earned or paid in cash, $146,039 in stock awards, and $2,000 in all other compensation. For the fiscal year ended December 31, 2019, Defendant Hagemann received $290,339 in compensation from the Company. This included $122,000 in fees earned or paid in cash, $166,339 in stock awards, and $2,000 in all other compensation.

63.     The Company's 2020 Proxy Statement stated the following about Defendant Hagemann:

> Mr. Hagemann served as Senior Vice President and Chief Financial Officer of Quest Diagnostics Incorporated until he retired in 2013.Mr. Hagemann joined Quest's predecessor, Corning Life Sciences, Inc., in 1992, and held roles of increasing responsibility until he was named Chief Financial Officer of Quest in 1998. Prior to joining Corning, Mr. Hagemann held senior financial positions at Prime Hospitality, Inc. and Crompton & Knowles, Inc. He also held various positions in corporate accounting and audit at Merrill Lynch and Company and Ernst & Young.

The Board nominated Mr. Hagemann as a director because of his leadership experience and expertise in finance/accounting, business development, strategy, supply chains and government contracting, which the Board finds to be valuable skills that complement the other skills represented on our Board. In addition, Mr. Hagemann has leadership experience as Chief Financial Officer of a global public company. He also has experience as a director on global public company boards, including serving on audit, compensation and research/innovation/technology committees.

Consistent with our policies and practices related to director service, in making a determination as to Mr. Hagemann's nomination, the Board considered Mr. Hagemann's current service on the board of two other public companies. Mr. Hagemann was renominated based on his qualifications listed above, his valuable, significant contributions to the Board and Company and his demonstrated willingness and ability to commit adequate time and attention to all Board matters.

64.     Upon information and belief, Defendant Hagemann is a citizen of New York.

**Defendant Hilton**

65.     Defendant Michael F. Hilton ("Hilton") has served as a Company director since July 2012. He also serves as a member of the Compensation Committee and as a member of the Corporate Governance and Nominating Committee. According to the 2020 Proxy Statement, as of February 28, 2020, Defendant Hilton beneficially owned 15,477 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2020 was $38.04, Defendant Hilton owned over $588,745 worth of Ryder stock.

66.     For the fiscal year ended December 31, 2015, Defendant Hilton received $216,712 in compensation from the Company. This included $100,000 in fees earned or paid in cash and $116,712 in stock awards. For the fiscal year ended December 31, 2016, Defendant Hilton received $239,043 in compensation from the Company. This included $100,000 in fees earned or paid in cash and $139,043 in stock awards. For the fiscal year ended December 31, 2017, Defendant Hilton received $243,488 in compensation from the Company. This included $100,000 in fees earned or

paid in cash and $143,488 in stock awards. For the fiscal year ended December 31, 2018, Defendant Hilton received $253,088 in compensation from the Company. This included $100,000 in fees earned or paid in cash and $153,088 in stock awards. For the fiscal year ended December 31, 2019, Defendant Hilton received $276,860 in compensation from the Company. This included $100,000 in fees earned or paid in cash and $176,860 in stock awards.

67.     The Company's 2020 Proxy Statement stated the following about Defendant Hilton:

> Mr. Hilton served as the President and Chief Executive Officer of Nordson Corporation, an engineering and manufacturing company, from 2010 until he retired in 2019. Prior to joining Nordson, Mr. Hilton served as Senior Vice President and General Manager of Air Products & Chemicals, Inc. from 2007 until 2010 with specific responsibility for leading the company's global Electronics and Performance Materials segment. Mr. Hilton joined Air Products in 1976, where he held roles of increasing responsibility in a variety of management and operations positions. Air Products serves customers in industrial, energy, technology and healthcare markets worldwide with a unique portfolio of atmospheric gases, process and specialty gases, performance materials, equipment and services.

> The Board nominated Mr. Hilton as a director because of his leadership experience and expertise in global operations, strategy development, business to business marketing, and oversight of large and diverse business units, which the Board finds to be valuable skills that complement the other skills represented on our Board. In addition, Mr. Hilton has leadership experience as a Chief Executive Officer of a global public company. He also has experience as a director on two global public company boards, including serving on audit and governance committees.

> Consistent with our policies and practices related to director service, in making a determination as to Mr. Hilton's nomination, the Board considered Mr. Hilton's current role as CEO of another public company and service on the board of his company and one other public company. Mr. Hilton was renominated based on his qualifications listed above, his valuable contributions to the Board, his in-depth knowledge of the Company gleaned from his years of service on the Board, and his demonstrated willingness and ability to commit adequate time and attention to all Board matters.

68.     Upon information and belief, Defendant Hilton is a citizen of Ohio.

**Defendant Lundgren**

69.     Defendant Tamara L. Lundgren ("Lundgren") has served as a Company director since October 2012. She also serves as a member of the Board's Audit Committee and as a member of the Corporate Governance and Nominating Committee. According to the 2020 Proxy Statement, as of February 28, 2020, Defendant Lundgren beneficially owned 14,514 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2020 was $38.04, Defendant Lundgren owned approximately $552,113 worth of Ryder stock.

70.     For the fiscal year ended December 31, 2015, Defendant Lundgren received $216,726 in compensation from the Company. This included $101,000 in fees earned or paid in cash and $115,726 in stock awards. For the fiscal year ended December 31, 2016, Defendant Lundgren received $244,933 in compensation from the Company. This included $100,000 in fees earned or paid in cash and $137,433 in stock awards. For the fiscal year ended December 31, 2017, Defendant Lundgren received $244,275 in compensation from the Company. This included $100,000 in fees earned or paid in cash and $141,775 in stock awards and $2,500 in other compensation. For the fiscal year ended December 31, 2018, Defendant Lundgren received $260,263 in compensation from the Company. This included $101,000 in fees earned or paid in cash, $149,263 in stock awards, and $10,000 in other compensation. For the fiscal year ended December 31, 2019, Defendant Lundgren received $278,443 in compensation from the Company. This included $102,000 in fees earned or paid in cash, $166,443 in stock awards, and $10,000 in other compensation.

71.     The Company's 2020 Proxy Statement stated the following about Defendant Lundgren:

> Ms. Lundgren serves as President and Chief Executive Officer of Schnitzer Steel Industries, Inc., a position she has held since 2008. Schnitzer Steel is one of the largest manufacturers and exporters of recycled ferrous metal products in the United States with approximately 100 operating facilities in the United States, Puerto Rico and Canada.
>
> Ms. Lundgren joined Schnitzer Steel in 2005 as Chief Strategy Officer and subsequently served as Executive Vice President and Chief Operating Officer from 2006 until 2008. Prior to joining Schnitzer Steel, Ms. Lundgren was a managing director at JP Morgan Chase in London and managing director at Deutsche Bank AG in New York and London. Before joining Deutsche Bank, Ms. Lundgren was a partner at the law firm of Hogan & Hartson, LLP in Washington D.C.
>
> The Board nominated Ms. Lundgren as a director because of her leadership experience and expertise in global operations, strategy, finance and corporate law, which the Board finds to be valuable skills that complement the other skills represented on our Board. In addition, Ms. Lundgren has leadership experience as President and Chief Executive Officer of a global public company. She also has experience as a director on a global public company board.
>
> The Board has determined that Ms. Lundgren qualifies as an audit committee financial expert. Consistent with our policies and practices related to director service, in making a determination as to Ms. Lundgren's nomination, the Board considered Ms. Lundgren's current role as CEO of another public company and service on the board of her company. Ms. Lundgren was renominated based on her qualifications listed above, her valuable, significant contributions to the Board and Company and her demonstrated willingness and ability to commit adequate time and attention to all Board matters.

72.     Upon information and belief, Defendant Lundgren is a citizen of Oregon.

**Defendant Nieto**

73.     Defendant Luis P. Nieto, Jr. ("Nieto") has served as a Company director since February 2007. He also serves as a member of the Compensation Committee and as a member of the Finance Committee. Previously, he served as the Chair of the Finance Committee. According to the 2020 Proxy Statement, as of February 28, 2020, Defendant Nieto beneficially owned 24,708

shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2020 was $38.04, Defendant Nieto owned approximately $939,892 worth of Ryder stock.

74.     For the fiscal year ended December 31, 2015, Nieto received $249,637 in compensation from the Company. This included $114,000 in fees earned or paid in cash, $130,637 in stock awards, and $5,000 in all other compensation. For the fiscal year ended December 31, 2016, Nieto received $282,494 in compensation from the Company. This included $110,000 in fees earned or paid in cash, $162,494 in stock awards, and $10,000 in all other compensation. For the fiscal year ended December 31, 2017, Nieto received $287,793 in compensation from the Company. This included $110,000 in fees earned or paid in cash, $167,793 in stock awards, and $10,000 in all other compensation. For the fiscal year ended December 31, 2018, Nieto received $290,272 in compensation from the Company. This included $110,000 in fees earned or paid in cash, $170,272 in stock awards, and $10,000 in all other compensation. For the fiscal year ended December 31, 2019, Nieto received $311,751 in compensation from the Company. This included $104,000 in fees earned or paid in cash, $197,751 in stock awards and $10,000 in all other compensation.

75.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Nieto made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| May 9, 2018 | 1,990 | $67.93 | $135,181.70 |
| August 27, 2019 | 2,293 | $46.67 | $107,014.31 |

Thus, in total, before the fraud was exposed, Defendant Nieto sold 4,283 Company shares on inside information, for which he received over $242,196. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

76. The Company's 2020 Proxy Statement stated the following about Nieto:

Mr. Nieto served as President of the Consumer Foods Group for ConAgra Foods Inc. from 2007 until he retired in 2009.

Mr. Nieto joined ConAgra in 2005 and held various leadership positions, including President of the Meats Group and Refrigerated Foods Group. ConAgra is one of the largest packaged food companies in North America. Prior to joining ConAgra, Mr. Nieto was President and Chief Executive Officer of the Federated Group, a leading private label supplier to the retail grocery and foodservice industries, from 2002 to 2005. From 2000 to 2002, he served as President of the National Refrigerated Products Group of Dean Foods Company. Prior to joining Dean Foods, Mr. Nieto held positions in brand management and strategic planning with Mission Foods, Kraft Foods and the Quaker Oats Company. Mr. Nieto is the President of Nieto Advisory LLC, a consulting firm and is affiliated with Akoya Capital Partners.

The Board nominated Mr. Nieto as a director because of his leadership experience and expertise in finance, operations, supply chains, brand management, marketing and strategic planning, which the Board finds to be valuable skills that complement the other skills represented on our Board. In addition, Mr. Nieto has leadership experience in positions of executive oversight and senior management at a global public company. He also has experience as a director on a global public company board, including serving on audit and governance committees.

The Board nominated Mr. Nieto as a director because of his leadership experience and expertise in finance, operations, supply chains, brand management, marketing and strategic planning, which the Board finds to be valuable skills that complement the other skills represented on our Board. In addition, Mr. Nieto has leadership experience in positions of executive oversight and senior management at a global public company. He also has experience as a director on a global public company board, including serving on audit and governance committees.

Consistent with our policies and practices related to director service, in making a determination as to Mr. Nieto's nomination, the Board considered Mr. Nieto's past service on the board of another public company. Mr. Nieto was renominated based

28

on his qualifications listed above, his valuable, significant contributions to the Board and Company and his demonstrated willingness and ability to commit adequate time and attention to all Board matters.

77.     Upon information and belief, Defendant Nieto is a citizen of Illinois.

**Defendant Nord**

78.     Defendant David G. Nord ("Nord") has served as a Company director since March 2018. He also serves as a member and the Chair of the Board's Audit Committee and as a member of the Finance Committee. According to the 2020 Proxy Statement, as of February 28, 2020, Defendant Nord beneficially owned 9,255 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2020 was $38.04, Defendant Nord owned over $352,060 worth of Ryder stock.

79.     For the fiscal year ended December 31, 2018, Defendant Nord received $226,498 in compensation from the Company. This included $89,166 in fees earned or paid in cash and $137,332 in stock awards. For the fiscal year ended December 31, 2019, Defendant Nord received $266,330 in compensation from the Company. This included $100,000 in fees earned or paid in cash, $156,330 in stock awards, and $10,000 in all other compensation.

80.     The Company's 2020 Proxy Statement stated the following about Defendant Nord:

Mr. Nord serves Chairman and Chief Executive Officer of Hubbell Incorporated, an international manufacturer of electrical and electronic products for a broad range of non-residential and residential construction, industrial and utility applications. Mr. Nord has held this position since May 2014, and prior to that served as President and Chief Executive Officer of Hubbell since January 2013.

Mr. Nord joined Hubbell in 2005 as Senior Vice President and Chief Financial Officer, and subsequently served as President and Chief Operating Officer from 2012 to 2013. Prior to joining Hubbell, Mr. Nord held various senior financial positions at United Technologies Corporation, including Vice President and Controller as well as Vice President of Finance and Chief Financial Officer of Hamilton Sundstrand Corporation, one of its principal subsidiaries.

The Board nominated Mr. Nord as a director because of his leadership experience, expertise in global operations and strong financial acumen, which the Board finds to be valuable skills that complement the other skills represented on our Board. In addition, Mr. Nord has leadership experience as President and CEO of a global public company. He also has experience as a director on a global public company board.

Consistent with our policies and practices related to director service, in making a determination as to Mr. Nord's nomination, the Board considered Mr. Nord's current role as CEO of another public company and service on the board of his company. Mr. Nord was nominated based on his qualifications listed above and his willingness and ability to commit adequate time and attention to all Board matters.

81.     Upon information and belief, Defendant Nord is a citizen of Connecticut.

**Defendant A. Smith**

82.     Defendant Abbie J. Smith ("A. Smith") has served as a Company director since July 2003. She also serves as the Chair of the Finance Committee and as a member of the Board's Audit Committee. According to the 2020 Proxy Statement, as of February 28, 2020, Defendant A. Smith beneficially owned 51,933 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2020 was $38.04, Defendant A. Smith owned approximately $2 million worth of Ryder stock.

83.     For the fiscal year ended December 31, 2015, Defendant A. Smith received $256,309 in compensation from the Company. This included $119,000 in fees earned or paid in cash and $137,309 in stock awards. For the fiscal year ended December 31, 2016, Defendant A. Smith received $274,760 in compensation from the Company. This included $101,000 in in fees earned or paid in cash and $173,760 in stock awards. For the fiscal year ended December 31, 2017, Defendant A. Smith received $280,408 in compensation from the Company. This included $100,952 in fees earned or paid in cash and $179,456 in stock awards. For the fiscal year ended December 31, 2018, Defendant A. Smith received $283,066 in compensation from the Company.

This included $101,000 in fees earned or paid in cash and $182,066 in stock awards. For the fiscal year ended December 31, 2019, Defendant A. Smith received $328,175 in compensation from the Company. This included $108,000 in fees earned or paid in cash and $220,175 in stock awards.

84.     The Company's 2020 Proxy Statement stated the following about Defendant A. Smith:

> Ms. Smith serves as the Boris and Irene Stern Distinguished Service Professor of Accounting at the University of Chicago Booth School of Business.
>
> Ms. Smith joined the faculty of the University of Chicago Booth School of Business in 1980 upon completion of her Ph.D. in Accounting at Cornell University. The primary focus of her research is corporate restructuring, transparency and corporate governance. She was nominated for a 2005 Smith Breeden Prize for her publication in The Journal of Finance and has received a Marvin Bower Fellowship from the Harvard Business School, a McKinsey Award for Excellence in Teaching and a GE Foundation Research Grant.
>
> The Board nominated Ms. Smith as a director because of her leadership experience and expertise in business, accounting and corporate governance, which the Board finds to be valuable skills that complement the other skills represented on our Board. In addition, Ms. Smith has an accomplished educational background with extensive academic and teaching experience in business, accounting and corporate governance. She also has experience as a director on global public company boards, including serving as lead independent director and member of audit and governance committees.
>
> Consistent with our policies and practices related to director service, in making a determination as to Ms. Smith's nomination, the Board considered Ms. Smith's current role as a professor of a distinguished university and service on the board of three other companies. Ms. Smith was renominated based on her qualifications listed above, her valuable, significant contributions to the Board and Company and her demonstrated willingness and ability to commit adequate time and attention to all Board matters.

85.     Upon information and belief, Defendant A. Smith is a citizen of Illinois.

**Defendant E. Smith**

86.    Defendant E. Follin Smith ("E. Smith") has served as a Company director since July 2005. She also serves as the Chair of the Compensation Committee and as a member of the Corporate Governance and Nominating Committee. According to the 2020 Proxy Statement, as of February 28, 2020, Defendant E. Smith beneficially owned 32,668 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2020 was $38.04, Defendant E. Smith owned over $1.2 million worth of Ryder stock.

87.    For the fiscal year ended December 31, 2015, Defendant E. Smith received $258,118 in compensation from the Company. This included $114,000 in fees earned or paid in cash, $134,118 in stock awards, and $10,000 in all other compensation. For the fiscal year ended December 31, 2016, Defendant E. Smith received $287,319 in compensation from the Company. This included $109,000 in fees earned or paid in cash, $168,319 in stock awards, and $10,000 in all other compensation. For the fiscal year ended December 31, 2017, Defendant E. Smith received $298,451 in compensation from the Company. This included $115,000 in fees earned or paid in cash, $173,747 in stock awards, and $9,704 in all other compensation. For the fiscal year ended December 31, 2018, Defendant E. Smith received $299,508 in compensation from the Company. This included $115,000 in fees earned or paid in cash, $175,155 in stock awards, and $9,353 in all other compensation. For the fiscal year ended December 31, 2019, Defendant E. Smith received $320,033 in compensation from the Company. This included $115,000 in fees earned or paid in cash and $205,033 in stock awards.

88.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant E. Smith made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| May 7, 2018 | 988 | $68.41 | $67,589.08 |
| May 7, 2019 | 1,138 | $62.82 | $71,489.16 |

Thus, in total, before the fraud was exposed, Defendant E. Smith sold 2,126 Company shares on inside information, for which she received over $139,078. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

89.     The Company's 2020 Proxy Statement stated the following about Defendant E. Smith:

> Until May 2007, Ms. Smith served as the Executive Vice President, Chief Financial Officer and Chief Administrative Officer of Constellation Energy Group, Inc., then the nation's largest competitive supplier of electricity to large commercial and industrial customers and the nation's largest wholesale power seller. Ms. Smith joined Constellation Energy Group as Senior Vice President, Chief Financial Officer in June 2001 and was appointed Chief Administrative Officer in December 2003.

> Before joining Constellation Energy Group, Ms. Smith was Senior Vice President and Chief Financial Officer of Armstrong Holdings, Inc., the global leader in hard-surface flooring and ceilings. Prior to joining Armstrong, Ms. Smith held various senior financial positions with General Motors, including Chief Financial Officer for General Motors' Delphi Chassis Systems division.

> The Board nominated Ms. Smith as a director based on her leadership experience and expertise in finance, human resources, risk management, legal and information technology, which the Board finds to be valuable skills that complement the other skills represented on our Board. In addition, Ms. Smith has leadership experience serving as Chief Financial Officer and Chief Administrative Officer of global

33

public companies. She also has experience as a director on other global public company boards, including serving on audit, governance and risk committees.

Consistent with our policies and practices related to director service, in making a determination as to Ms. Smith's nomination, the Board considered Ms. Smith's past experience as a CFO and service on other company boards. Ms. Smith was renominated based on her qualifications listed above, her valuable, significant contributions to the Board and Company and her demonstrated willingness and ability to commit adequate time and attention to all Board matters.

90.     Upon information and belief, Defendant E. Smith is a citizen of Pennsylvania.

**Defendant Stockton**

91.     Defendant Dmitri L. Stockton ("Stockton") has served as a Company director since March 2018. He also serves as a member of the Compensation Committee and Finance Committee. According to the 2020 Proxy Statement, as of February 28, 2020, Defendant Stockton beneficially owned 6,335 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2020 was $38.04, Defendant Stockton owned over $240,983 worth of Ryder stock.

92.     For the fiscal year ended December 31, 2018, Defendant Stockton received $236,498 in compensation from the Company. This included $89,166 in fees earned or paid in cash, $137,332 in stock awards, and $10,000 in all other compensation. For the fiscal year ended December 31, 2019, Defendant Stockton received $266,330 in compensation from the Company. This included $100,00 in fees earned or paid in cash, $156,330 in stock awards, and $10,000 in all other compensation.

93.     The Company's 2020 Proxy Statement stated the following about Defendant Stockton:

Mr. Stockton most recently served as Senior Vice President and Special Advisor to the Chairman of General Electric Company (GE) from 2016 until his retirement in

34

2017. GE is a multinational industrial company that provides power and water, aviation, oil and gas, healthcare, appliances and lighting, energy management, transportation and financial services.

Mr. Stockton joined GE in 1987 and held various positions of increasing responsibility during his 30 year tenure. From 2011 to 2016, Mr. Stockton served as Chairman, President and Chief Executive Officer of GE Asset Management, a global asset management company affiliated with GE, and as Senior Vice President of GE. From 2008 to 2011, he served as President and Chief Executive Officer for GE Capital Global Banking and Senior Vice President of GE in London, UK. He previously also served as President and Chief Executive Officer for GE Consumer Finance for Central and Eastern Europe.

The Board nominated Mr. Stockton as a director because of his leadership experience and his expertise in risk management, governance, finance and asset management, which the Board finds to be valuable skills that complement the other skills represented on our Board. In addition, Mr. Stockton also has leadership experience in positions of executive oversight and senior management from his tenure at GE, as well as experience as a director on public company boards.

Consistent with our policies and practices related to director service, in making a determination as to Mr. Stockton's nomination, the Board considered Mr. Stockton's current service on the Board of three other public companies. Mr. Stockton was nominated based on his qualifications listed above and his willingness and ability to commit adequate time and attention to all Board matters.

94.     Upon information and belief, Defendant Stockton is a resident of Connecticut.

**Defendant Tookes**

95.     Defendant Hansel E. Tookes, II ("Tookes") has served as a Company director since September 2002. He has also served as the Chair of the Corporate Governance and Nominating Committee and as a member of the Board's Audit Committee. Additionally, Defendant Tookes has also served as the Company's Lead Independent Director. According to the 2020 Proxy Statement, as of February 28, 2020, Defendant Tookes beneficially owned 41,591 shares of the Company's common stock. Given that the price per share of the Company's common stock at the

close of trading on February 28, 2020 was $38.04, Defendant Tookes owned approximately $1.6 million worth of Ryder stock.

96.     For the fiscal year ended December 31, 2015, Tookes received $260,122 in compensation from the Company. This included $122,000 in fees earned or paid in cash and $138,122 in stock awards. For the fiscal year ended December 31, 2016, Tookes received $315,910 in compensation from the Company. This included $136,000 in fees earned or paid in cash, $174,910 in stock awards, and $5,000 in all other compensation. For the fiscal year ended December 31, 2017, Tookes received $316,843 in compensation from the Company. This included $136,000 in fees earned or paid in cash and $180,843 in stock awards. For the fiscal year ended December 31, 2018, Tookes received $329,125 in compensation from the Company. This included $136,000 in fees earned or paid in cash, $183,125 in stock awards, and $10,000 in all other compensation. For the fiscal year ended December 31, 2019, Tookes received $358,844 in compensation from the Company. This included $137,000 in fees earned or paid in cash and $221,844 in stock awards.

97.     The Company's 2020 Proxy Statement stated the following about Tookes:

Mr. Tookes served as President of Raytheon International until he retired from Raytheon Company in December 2002.

Mr. Tookes joined Raytheon in September 1999 as President and Chief Operating Officer of Raytheon Aircraft Company. He was appointed Chief Executive Officer in January 2000, Chairman in August 2000 and became President of Raytheon International in May 2001. Prior to joining Raytheon in 1999, Mr. Tookes served as President of Pratt & Whitney's Large Military Engines Group since 1996. He joined Pratt & Whitney's parent company, United Technologies Corporation, in 1980. Mr. Tookes was a Lieutenant Commander and military pilot in the U.S. Navy and later served as a commercial pilot with United Airlines.

The Board nominated Mr. Tookes as a director because of his leadership experience and expertise in global operations, the transportation industry, the U.S. military and

government contracting, which the Board finds to be valuable skills that complement the other skills represented on our Board. In addition, Mr. Tookes has leadership experience in positions of executive oversight and senior management at global public companies. He also has experience as a director on global public company boards, including serving as governance committee chair and member of audit, compensation, finance and executive committees.

Consistent with our policies and practices related to director service, in making a determination as to Mr. Tookes' nomination, the Board considered Mr. Tookes' current service on the board of three other public companies. Mr. Tookes was renominated based on his qualifications listed above, his valuable, significant contributions to the Board and Company and his demonstrated willingness and ability to commit adequate time and attention to all Board matters.

98.     Upon information and belief, Defendant Tookes is a citizen of Florida.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

99.     By reason of their positions as officers, directors, and/or fiduciaries of Ryder, and because of their ability to control the business and corporate affairs of Ryder, the Individual Defendants owed Ryder and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Ryder in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Ryder and its shareholders so as to benefit all shareholders equally.

100.    Each director and officer of the Company owes to Ryder and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

101.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Ryder, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

102.    To discharge their duties, the officers and directors of Ryder were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

103.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Ryder, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware of or should have been aware of posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Ryder's Board at all relevant times.

104.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described

in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

105.    To discharge their duties, the officers and directors of Ryder were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Ryder were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Florida and the United States, and pursuant to Ryder's own Code of Conduct;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Ryder conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Ryder and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Ryder's operations would comply with all

applicable laws and Ryder's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

106.    Each of the Individual Defendants further owed to Ryder and the shareholders the duty of loyalty requiring that each favor Ryder's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

107.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Ryder and were at all times acting within the course and scope of such agency.

108.    Because of their advisory, executive, managerial, and directorial positions with Ryder, each of the Individual Defendants had access to adverse, non-public information about the Company.

109.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements made by Ryder.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

110.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

111.    The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

112.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Ryder, was a

direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

113.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

114.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Ryder and was at all times acting within the course and scope of such agency.

## RYDER'S CORPORATE GOVERNANCE GUIDELINES

115.    The Company's Corporate Governance Guidelines (the "Guidelines") provide that the Board is elected "to oversee the management of the Company and its business in accordance with applicable laws and regulations." According to the Guidelines, the Board is responsible for, among other things, "reviewing, approving and monitoring important financial and business strategies"; "overseeing the integrity of the Company's financial statements, public disclosures and financial reporting processes in accordance with applicable laws and regulations"; and "overseeing risk assessment, risk monitoring process and compliance with applicable laws and regulations."

116.    In a section titled, "Board Membership Policies," the Guidelines state the following:

Directors are charged with a fiduciary duty to the Company and to all of the Company's shareholders. In satisfying this fiduciary duty, directors shall strive to make decisions that are in the best interests of the Company and all of its shareholders, in accordance with applicable law. Directors should represent the best interests of the Company and its shareholders as a whole rather than any special interest groups or constituencies, and directors must not be beholden to any such special interests or constituencies.

117.    In a section titled, "Ethics and Conflicts of Interest," the Guidelines state the following:

The Board expects its members, as well as officers and employees, to act ethically at all times and to be familiar with and acknowledge their adherence to the policies comprising the Company's Principles of Business Conduct, which include policies regarding conflicts of interest, corporate opportunities and confidentiality. There shall be no waiver of any part of the Principles of Business Conduct (including conflicts of interest) for members of the Board or any executive officer, except by a majority vote of the Company's Board or the Corporate Governance and Nominating Committee, which will ascertain whether the waiver is appropriate and will ensure that the waiver is accompanied by appropriate controls designated to protect the Company. Although the Board cannot conceive of any circumstances under which such a waiver would be granted, in the extraordinary event that a waiver is granted to a member of the Board or an executive officer, the waiver will be posted on the Company's website and may be disclosed in a public filing made with the SEC.

## RYDER'S PRINCIPLES OF BUSINESS CONDUCT

118.    The Company's Principles of Business Conduct (the "Code of Conduct") is applicable to everyone, including all employees, directors, and officer of Ryder, and provides that "[i]t is the responsibility of every employee, director, officer, and representative of Ryder to know and comply with our Principles of Business Conduct . . . [and] all applicable laws and regulations in the countries where we do business."

119.    In a section titled, "Our Reputation," the Code of Conduct states that, "[h]aving a strong reputation helps us in all areas of our business. It gives us a competitive advantage with

customers and investors. It attracts more good people to join our team. All of these advantages help us stay on top in our industry."

120.     In a section titled, "Additional Responsibilities for Officers, Directors, and Managers," the Code of Conduct states that "[a]t Ryder, we expect our officers, directors, and managers to show their character as leaders. That means we hold them to a higher standard with regard to our Principles, and raise our expectations as people are given more responsibility and authority within the company." Ryder officers, executives, and managers are expected to "monitor ethical behavior in others and be on the lookout for violations of our policies" and "[r]eport [their] own misconduct when circumstances require it."

121.     In a section titled, "Raising Concerns" the Code of Conduct states that, "[w]hen something is not right, we say so. When an issue needs our attention, we deal with it."

122.     In a section titled "Showing Our Character," the Code of Conduct states that, "we show our character by acting with integrity when dealing with each other, our customers, and others we interact with on behalf of the company."

123.     In a section titled, "Complying with the Law and Governmental Inspections," the Code of Conduct states that, "we fully comply with all of the laws and regulations that apply to our business throughout the world."

124.     In a section titled, "Ensuring Accurate Records and Metrics," the Code of Conduct states the following:

> At Ryder, our books, records, and financial statements must be honest, accurate, objective, complete, and timely. This is important so that we can make sound business decisions for Ryder. It is also required that we truthfully reflect our business to investors in reports and documents filed with the Securities and Exchange Commission and in other public communications.  Ryder's financial

44

integrity is dependent on everyone being honest and accurate in their daily record-keeping.

At Ryder we're always trying to do a good thing better. That's hard if we don't have accurate records for measuring and managing our work. Recording false date also causes legal and financial risks to Ryder, which is why it can be cause for discipline or dismissal. So when it comes to entering data of any kind, we expect 100% accuracy.

125.    In a section titled, "Obeying Insider Information and Securities Trading Laws," the

Code of Conduct states the following:

The rules on insider trading are clear: it's against the law. If you have access to financial, operational, or strategic information about Ryder or other companies that is both material and not publicly disclosed, it's unlawful and against our policies to use it for personal gain – for yourself or anyone else.

It's also against our policy and the law to give insider information to others. This includes family members and co-workers at Ryder who do not have a need to know the information. If you're not aware of what constitutes insider information, talk to your manager, read Ryder's policy on insider trading, or contact the Law Department.

126.    In a section titled, "Trading Windows for Officers and Designated Employees," the

Code of Conduct further states that, "Ryder's Principles and policy on insider trading prohibit us

from using material information for trading in Ryder stock unless that information has been

disclosed to the public."

127.    In violation of the Code of Conduct and the Guidelines, the Individual Defendants

conducted little, if any, oversight of the Company's engagement in the Individual Defendants'

scheme to engage in improper accounting practices, to issue materially false and misleading

statements to the public, and to facilitate and disguise the Individual Defendants' violations of law,

including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations

of the Exchange Act, and aiding and abetting thereof. Moreover, six of the Individual Defendants

violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

128.    Based in Miami, Florida, Ryder is a global provider of transportation and supply chain management products, including truck leasing. As noted above, the Company operates through three segments: (1) FMS; (2) DTS; and (3) SCS.

### *Ryder's Financial Success was Heavily Dependent upon its FMS Segment*

129.    The Company's FMS segment—which provides full-service leasing and leasing with flexible maintenance options, commercial rental, and contract or transactional maintenance services of trucks, tractors and trailers—accounts for over 60% of the Company's revenue and operates in the United States, Canada, and Europe.

130.    The FMS segment has multiple components, including the ChoiceLease Program, Commercial Rental, and Used Vehicles. The ChoiceLease Program accounts for more than half of FMS revenue and provides long term rentals. The Commercial Rental segment provides shorter term vehicle rentals to customers, and the Used Vehicles segment sells Ryder's used vehicles at the end of the vehicle's useful life, either from one of the Company's 51 retail sales centers or through the Company's website.

131.    The financial performance of Ryder's FMS segment is dependent on demand for truck rentals and leases, as well as demand for those used trucks once the truck's useful life is over.

132.    The vehicles that Ryder leases to consumers typically have a useful life of approximately seven to eight years.  Once the term lease ends, or after the vehicle reaches its useful life, Ryder sells the vehicle through its Used Truck Centers ("UTCs"), which sell the used vehicles throughout North American and through the Company's website.

133.    It is important for Ryder to sell its vehicles promptly, because the longer Ryder holds on to a vehicle on one of its lots, the more it will depreciate, which increases the likelihood that the vehicle's value will fall below the residual value that Ryder has internally designated for that vehicle. If Ryder is unable to sell the vehicle at a favorable price, it will incur a loss from the sale, which negatively impacts Ryder's earnings.

134.    Because most of the Company's assets are tied up with its fleet of trucks and tractors, i.e., its revenue-earning equipment, the valuation of these assets is critical to the Company's finances.

### Ryder Failed to Accurately Report the Residual Values and Depreciation Expenses of Its Vehicles

135.    Like all other publicly-traded companies, Ryder is required to comply with GAAP, which is the standard for accounting accepted by the SEC. SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

136.    Under GAAP, financial elements such as assets, liabilities, revenues, and expenses must be recorded pursuant to the "accrual" method of accounting. The objective of this method is to reflect transactions within the appropriate period that their costs and associated revenues relate. Central to accrual accounting is the "matching principle," which requires companies to report expenses in the same period as their related revenues (as opposed to when cash is actually received

or paid out).

137.     In its SEC filings during the Relevant Period, Ryder referred to the assets that primarily contributed to its reported revenue as "revenue-earning equipment." Ryder's revenue-earning equipment was comprised of vehicles and operating property and equipment (e.g., trucks, tractors, and trailers). Throughout the Relevant Period, the reported value of Ryder's revenue-earning equipment constituted the majority of its assets.

138.     Pursuant to GAAP's matching principle, Ryder was required to recognize expenses associated with its vehicles (i.e., revenue-earning equipment) in the same reporting periods that revenue generated by such equipment was recognized. One such expense was the vehicle's depreciation, which is the reduction in the asset's value over time.

139.     ASC 360, *Property, Plant, and Equipment* ("ASC 360"), provides that depreciation expense "shall be determined on the asset's useful life" and "require[s] that this cost be spread over the expected useful life of the facility in such a way as to allocate it is equitably as possible to the periods during which services are obtained from the use of the facility."

140.     Therefore, under GAAP's matching principle and ASC 360, Ryder was required to reduce the carrying value of its revenue-earning equipment by recognizing depreciation expense during the reporting periods that such equipment was expected to provide economic benefits to the Company.

141.     According to its financial statements, Ryder calculated the depreciation expense on its revenue-earning equipment using the straight-line method. Under this method, depreciation is calculated by subtracting an asset's residual value—the price at which Ryder expected to dispose of the revenue-earning equipment after its useful life—from its cost, and then dividing

the remaining amount by the number of years such asset is expected to be used.

142.     The reported value of the Company's revenue-earning equipment constituted most of its assets during the Relevant Period, and throughout the Relevant Period, the Company reported that its depreciation expense was greater than $1 billion in each year. Therefore, the assumptions used to calculate the depreciation expense for such equipment—the useful lives and residual values for such equipment—were critical to the legitimacy of the Company's reported financial results. For example, as the Company explain in SEC filings, "[r]eductions in [its] residual values … or useful lives [would] result in an increase in depreciation expense over the life of the equipment" which would reduce the Company's reported earnings.

143.     In light of this, the residual values used by the Company in its computation of depreciation expense on its revenue-earning equipment were required to be based on the most accurate and up-to-date information the Company had at the time such residual value estimates were made in order for the financial results reported in its SEC filings to comply with GAAP and not be misleading.

144.     Given the importance of residual values, during the Relevant Period, the Company claimed in its SEC filings that it "review[ed] residual values and useful lives of revenue-earning equipment on an annual basis or more often if deemed necessary." In addition,, Ryder further disclosed that it had a process to "monitor market trends throughout the year and assess residual values of vehicles expected to be sold in the near term" and that, as a result, the Company "may adjust residual values for [its] vehicles."

145.     Despite this, as discussed in detail below, throughout the Relevant Period, the Company overstated the residual value of its trucking fleet, which allowed the Company to record

lower depreciation expense on those assets each year, which in turn artificially inflated the Company's earnings and misrepresented the Company's true financial position.

146.    In addition, throughout the Relevant Period, the Company overstated the book value of its revenue-earning equipment by understating its depreciation expense during the equipment's useful life and by failing to reduce the net book value of such equipment by impairment. ASC 360 defines impairment as "the condition that exists when the carrying amount of a long-lived asset (asset group) exceeds its fair value" and requires that equipment that is intended to be "held and used" must be tested for recoverability when a company is aware of evidence or warning signs that the revenue-earning equipment's carrying amount may not be recoverable when comparing carrying value of such equipment to its actual fair value.

### Used Vehicle Prices Dramatically Declined Starting in Mid-2015

147.    Despite this, throughout the Relevant Period, the Company ignored, or recklessly disregarded, warning signs that the Company's revenue-earning equipment was inflated because of understated depreciation expense and overstated residual value. Throughout the Relevant Period, the carrying value of the revenue-earning equipment was higher than the actual fair value of such equipment, i.e., the carrying value was higher than the actual price at which Ryder could sell the vehicle at the end of its useful life.

148.    Beginning in 2015, Ryder witnessed a drastic decline in the demand for, and sales prices of, used vehicles. By late 2015, including because of the new emissions technology, the market for used vehicles, and especially tractors, weakened drastically. As Defendant Sanchez, Ryder's CEO, recently acknowledged: "Following the mid-2015 peak [in used vehicle prices], tractor proceeds ***declined sharply through 2017 to below our accounting residuals*** as supply

50

entered the market and the freight environment slowed" (emphasis added).

149.    Because the market for used vehicles, especially tractors, greatly declined starting in mid-2015, Ryder should have adjusted its residual values accordingly. Instead, the Defendants repeatedly pushed back against efforts by Ryder management and employees to reduce the sales prices of Ryder vehicles or their residual values. In fact, even though Ryder saw that its used vehicles' resale values were far below their residual values, Ryder continued to increase residual values, understate depreciation expense, and overstate net income.

150.    The Company adjusted residual values and depreciable lives upward from 2011 through 2016, and greatly benefitted in 2017 and 2018 from the overstated residual values and understated depreciation expense. From 2011 through 2016, the percentage contribution of the Company's scheme to increase residual values made an progressively large contribution to Ryder's adjusted pre-tax income.

### Defendants Failed to Adjust the Residual Values of its Revenue-Earning Equipment Despite a Sharp Decline in Used Vehicle Prices

151.    Beginning in mid-2015 at the latest, the Company's changes to its residual values far exceeded the actual fair value, i.e., the sales prices that it obtained in the market for its used vehicles. The Company's used tractor sales price as a percentage of their original cost declined 15% in 2016, from approximately 130% in 2015 to approximately 110% in 2016. This price decline, as well as those that followed in subsequent years, were not fully reflective of the actual decline in the Company's tractors' values because the Company turned down calls to reduce the prices of its vehicles further—instead, choosing to hold onto the vehicles to avoid the significant financial hit from their sales.

152.    Nevertheless, despite the 15% decline in Ryder's used tractor sales prices in 2016,

rather than decrease the residual value of its fleet, as it should have, Ryder increased its residual values by approximately $35 million in 2016.

153.    The used sales price decline continued into 2017, this time declining a staggering 35% (from prices in 2015). Again, despite this even sharper decline in used vehicle sale prices in 2017, Ryder decreased the residual value of its fleet by a miniscule $4 million in 2017.

154.    By 2018, the drop in used tractor sale prices continued, declining by 38.5% from approximately 130% in 2015 to approximately 80% in 2018. Again, despite this continued decline in used vehicle sale prices in 2018 (compared to the high of 2015), Ryder only decreased the residual value of its fleet by a mere $79 million in 2018. This residual value reduction was woefully inadequate.

### *Ryder Executives Controlled Used Vehicle Prices and Residual Value Estimates*

155.    Despite the steep decline in used vehicle prices, the executives at Ryder headquarters in Miami, Florida repeatedly pushed back against efforts by Ryder management and employees to reduce the sales prices of Ryder vehicles, or to reduce the vehicles' residual value estimates.

156.    The pricing and valuation of the vehicles, including residual values and used sale prices, was a top-down process that took place at the Company's headquarters. This left Ryder retail offices across the country powerless to control these prices.

157.    Numerous former Ryder employees described that a small group of Ryder executives set the residual values, with the ultimate decision being made at Ryder's corporate headquarters in Miami.

158.    One former Ryder Vehicle Sales Representative from November 2016 through

April 2019, who was responsible for evaluating used vehicles for a pricing determination, stated that he and his manager did not have control over the pricing of the vehicles they sold. This former employee stated that when a truck came to them for sale, the sales representatives filled out a checklist evaluation, took pictures, and sent them to headquarters in Miami. This former employee also stated that the individuals approving the sales price would have to know the residual value assigned to that vehicle in order to approve the price.

159.    Another employee, who served on the Asset Management Board, said that the Asset Management Board met quarterly in a conference room in Miami with the asset managers and the Vice President, Eugene Tangney.

160.    Another employee, who was a Vehicle Sales Manager until 2017, a Bailment Supervisor from 2017 to 2019, and a Senior Logistics Analyst from 2019 to February 2020, said that he was intimately involved with vehicle pricing and participated in weekly and monthly calls with Company Executives, including Defendant Sanchez.

### The Company Finally Reduced its Residual Value Estimates

161.    The Company finally reduced its residual value estimates by $844 million in the third quarter of 2019, which resulted in a $357 million increase in depreciation, and reported a loss of approximately $58 million on the sale of used vehicles. Defendant Sanchez attributed it to how: (i) the residual values of the vehicles have "been negatively impacted by maintenance costs on the early model years of the post-2010 emissions technology;" and (ii) "these vehicles as they come off lease are now expected to be sold in a down market at below price levels." However, by mid-2015, Ryder already knew of these two negative developments and that it needed to adjust downward its vehicles' residual values at that time as a result. Its failure to do

so was a violation of GAAP.

162.    When the Company disclosed in the third quarter of 2019 the need for drastic residual value reductions, the Company based it on the decline in used tractor sale priced in the third quarter of 2019. During the Company's October 29, 2019 earnings call, Defendant Sanchez stated "we started seeing softening market conditions for used tractors" in June 2019 and those conditions "continued to worsen in the third quarter [of 2019]" and "[t]his triggered a review and lowering of residual value estimates on power vehicles."

163.    However, the "decline" was simply a return to the same prices that Ryder was obtaining for its tractors in 2018, and a small increase and then decrease in used tractor prices in late 2018 and early 2019 was not the first warning sign of the Company's need to re-evaluate its residual values. In reality, the Company should have re-evaluated its residual values in mid-2015, when there was a sharp and consistent decline in prices from the 2015 peak. This sharp, consistent decline comports with the actual $844 million decrease in residual value estimates that Ryder finally made in the third quarter of 2019 (instead of the measly $75 million adjustment the Company took in 2018, when its tractors were at the identical market values as in the third quarter of 2019).

### The Company Claimed That It Reviewed Residual Values and Depreciation, Yet Pushed Back Employee Concerns to Write Down the Used Vehicles

164.    The Company claimed in its annual reports filed with the SEC that Ryder performed yearly reviews of its residual values and depreciation expense to make sure that they correctly represented "historical market price changes, current and expected future market price trends, expected life of vehicles included in the fleet and extent of alternative uses for leased vehicles[.]" Ryder claimed that it set its residual values through a review of a number of factors

(and rather than blindly following a purported five-year rolling average):

> Depreciation and Residual Value Guarantees. ***We periodically review and adjust the residual values and useful lives of revenue earning equipment of our FMS business segment*** as described in Note 1, "Summary of Significant Accounting Policies — Revenue Earning Equipment, Operating Property and Equipment, and Depreciation" in the Notes to Consolidated Financial Statements. Reductions in residual values (i.e., the price at which we ultimately expect to dispose of revenue earning equipment) or useful lives will result in an increase in depreciation expense over the life of the equipment.
>
> We review residual values and useful lives of revenue earning equipment on an annual basis or more often if deemed necessary for specific groups of our revenue earning equipment. Reviews are performed based on vehicle class, generally subcategories of trucks, tractors and trailers by weight and usage***. Our annual review is established with a long-term view considering historical market price changes, current and expected future market price trends, expected life of vehicles included in the fleet and extent of alternative uses for leased vehicles (e.g., rental fleet, and DTS and SCS applications)***.   As a result, future depreciation expense rates are subject to change based upon changes in these factors.  While we believe that the carrying values and estimated sales proceeds for revenue earning equipment are appropriate, there can be no assurance that deterioration in economic conditions or ***adverse changes to expectations of future sales proceeds will not occur***, resulting in lower gains or losses on sales.

(Emphasis added.)

165.    Notwithstanding the Company's declarations of periodic review and adjustment of residual values the Individual Defendants knew during the Relevant Period that the market for Ryder used vehicles had declined greatly, that the new emissions vehicles had substantially higher maintenance costs, and that Ryder was overstating its residual values.

166.    In fact, Ryder senior management and executives regularly brought concerns to their supervisors who were involved in the most senior discussions to set the residual values.

167.    For example, a former employee who worked as a Vehicle Sales Manager from prior to the Relevant Period to September 2016 in the Company's Asset Management Division, reported that "the values of the equipment were completely off" and "it was pretty clear that they

needed to write-down the equipment." This former employee stated that, despite these clear warning signs, upper management, including Defendants Sanchez and Garcia, pushed back on not writing down the used vehicles. Another employee stated that senior management, including Defendants Sanchez and Garcia, participated in weekly and monthly phone calls which discussed the Company's vehicles' valuations and depreciation. This former employee would "scream until [he] was blue in the face" about how Ryder's vehicles were overpriced but would receive pushback from Sanchez and Garcia, with excuses such as the Company did not want to lose money on the trucks and that the Company could not afford to lower the prices.

168.    Another former employee, who worked as the Company's Director of Asset Management Canada from 2011 to 2018, stated that the Company's senior management and executives received internal reports regarding residual values and depreciation and met quarterly to discuss to status of their used vehicle valuation and pricing. This former employee's last position was director of asset management Canada, which entailed ensuring that assets were depreciating as they should and making sure the vehicles sold. This former employee was also a member of the pricing committee. employee told the finance group at the Company that they should be writing down the vehicles but was told to sit on the inventory. He further explained that residuals were never adjusted as they should have been throughout the course of the lease. Although this former employee continuously raised "red flags like crazy, he received a lot of pushback from Defendant Cooke, the President of Sales, and others.

169.    Another former employee, who worked in various positions for the Company including as a Vehicle Sales Manager beginning prior to the Relevant Period and until 2017, a Bailment Supervisor from 2017 until 2019, and Senior Logistics Analyst from 2019 to February

2020, stated that he had week and monthly phone calls with the Company's executives during which valuations and depreciation were discussed. This former employee would "scream until [he] was blue in the face" about how the Company's vehicles were overpriced but would receive pushback from Defendants Sanchez and Garcia for a number of reasons, including that they did not want to lose money on the trucks and that Ryder could not afford to lower the prices.

170.    Another former employee, who was a Vehicle Sales Manager in the Asset Management Division until September 2016, stated that there was talk of the need for write downs in 2015 and 2016 because the values had already depreciated much lower than expected. However, this former employee stated that the Company "had no interest in writing down whatsoever."

171.    A former Director of Used Vehicle Sales at Ryder from May 2018 through September 2018 said that it was clear to him that the Company's residual value estimates exceeded the expected future sale price. This former employee brought up his concerns to his superior, Marc Thibeau, and stated that the Company understood that it would suffer a loss on the sale of its over-valued vehicles, but they were more concerned with keeping depreciation costs low in a beat the competition type mentality. This former employee's concerns about how Ryder was recognizing revenue were dismissed.

### Defendants Were Aware of the Steep Decline in Used Vehicle Prices and Ignored Warning Signs that Price Discounts and Serious Decreases in Residual Values Were Necessary

172.    Defendants admitted that they observed a steep decline in used tractor sales prices starting in mid-to-late-2015. In its third quarter 2019 earnings call, Defendants showed the following chart during a presentation:



173.    The above chart demonstrated that the Company experienced a precipitous decline in used tractor pricing during the Relevant Period, yet the Defendants did not accurately modify its vehicles residual values to reflect these price changes.

174.    When the Company finally reduced the residual values of its revenue-earning equipment, it stated that the need for extreme reductions was based on the decline in used tractor prices in the third quarter of 2019.  However, the decline in the third quarter of 2019 was a small decline after a brief increase in prices, and simply a return to the prices the Company was getting for its used tractors in 2018.  As demonstrated by the chart used during the Company's October 29, 2019 earnings conference call presentation, the decline started in mid-2015, not 2019:



175.   In explaining the above slide, Defendant Sanchez explained that the Company "stated seeing softening market conditions for sued tractors" in June 2019 and that those conditions "triggered a review and lowering of residual value estimates on power vehicles." However, as the chart clearly shows, the small increase and decrease in 2018/2019 was not the first trigger of the Company's need to re-evaluate its residual value estimates. Instead, the Company experienced a sharp decline in used vehicle prices starting in 2015 and continuing through the Relevant Period.

176.   In the second half of 2019, the Company made a $357 million adjustment and recorded a $58 million loss on sales of used vehicles.  These wiped out the previous financial benefits of increased residual values that the Company had reported through 2018. Allocating the 2019 loss ($357 million + $58 million = $415 million) to the years between mid-2105 to 2018 on a proportional basis results in the below estimates of the Company's true pretax earnings. If the Company had correctly estimated the residual values from mid-2015 through 2019, and the

resulting depreciation charge was correctly accounted for in the Company's disclosures, the Company's GAAP adjusted pretax income would have significantly diminished amounts in 2015 through 2018 compared to what the Company actually disclosed in its financial disclosure section of its disclosures.

### The Company Used a Five-Year Rolling Average to Capitalize on Historically High Prices

177.    To capitalize on the historically higher used truck prices from 2012-2015, the Defendants utilized a misleading five-year rolling average residual value methodology. Defendants did so despite knowing that this methodology did not accurately reflect the Company's vehicles' actual residual value.

178.    By relying on the five-year rolling average methodology, the Company continued to benefit from historically high prices, which had a recurring positive impact on the Company's reported financial results, despite knowing that it did not reflect the actual values of used vehicle prices. Using this methodology, the Company continued to value its vehicles significantly above the price the market was willing to pay, which rendered Ryder's reported residual values misleading.

179.    During the Relevant Period, despite the almost complete collapse of used truck and tractor pricing, Defendants continued to mislead the market about the residual value of the Company's fleet, and would only gradually recognize falling residual values when the Company was finally forced to sell its overvalued vehicles.

180.    By mid-2018, the Company was forced to abandon its 5-year rolling price average to better capture "where [they were] seeing sales today." On July 25, 2018, during Ryder's second quarter 2018 earnings call, Defendant Sanchez, in direct response to an analyst question, stated

that:

> Just so you know, we've historically always used a 5-year rolling average to determine our residual value or our sales proceed at the end of the lease term. ***At the beginning of this year is when we switched and then said, rather than just do a rolling 5-year average, let's just bring it to generally to where we're seeing sales today***.   And we did that.   That's primarily a Class 8 issue.   So we did that really across the tractor business.   And so beginning of the year is when we started that.

(Emphasis added.)

181.     Then, just over a year later, Defendant Sanchez explained that "[e]ffective July 1, [2019,] we further lowered our long-term view of residual values for vehicles expected to be sold starting in late 2021 to reflect more recent multiyear market trends in our outlook.  This view now excludes the peak pricing year of 2015." However, Defendants offered no explanation as to why, despite previously saying that the Company abandoned its 5-year rolling average methodology, any of its 2019 residual values supposedly included 2015 peak pricing.

### *The Company Knew, or Should Have Known, That Residual Value Estimates Were Inflated Based on Trend in Used Vehicle Sales*

182.     As further evidence that the Company overstated its vehicles residual values is the fact that they took increasingly larger losses on the sale of its used vehicles throughout the Relevant Period. In 2015, Ryder sold its used vehicles for proceeds of approximately  $100 million. The very next year, Ryder's net sales fell almost 99%  to only $972,000. In 2017, Ryder sold its vehicles at a ***loss*** of $17.24 million. In 2018, net used vehicles losses ***increased another 26% to $21.74 million***. In 2019, the Company's net loss on used vehicles increased 263% to $58.7 million.

183.     Despite the Company's internal goal of selling its used vehicles within 90 days of the vehicle arriving at one of the Company's UTCs, the Company's internal reports revealed that

there were hundreds, and sometimes thousands, of vehicles that were not sold for significantly over six months even though those vehicles hit the point of sale, and whose residual values were not revised.

184.     As of February 2016, the Company had a large number of vehicles with high residual values that should have been written down. As a result, the Company ended up with a significantly oversized used vehicle fleet.

185.     One former employee, who was a Director of Asset Management Canada from 2011 to 2018, stated that by 2015, it was "loud and clear" that used truck prices were declining. This former employee also stated that the Company's senior management and executives received internal reports regarding residual values and depreciation and met quarterly to discuss to status of their used vehicle valuation and pricing.

186.     Another former employee, who was a Vehicle Sales Representative at the Company's UTCs from November 2016 through April 2019, stated that the pricing of the Company's vehicles was "a lot" higher than competitors and that sales significantly decreased during his time with the Company. When he started, his office sold 50-60 trucks per month. That eventually declined to only 15-20 per month by 2019.

187.     The Company's inventory grew because it could not sell the vehicles and the Company did not want to send the vehicles that were not selling to auction and thereby realize the losses. The Company's vehicles were sitting on the Ryder lots for 180-365 days, whereas the target is typically only 90-180 days. Many trucks were sitting on the lots for over six months.

188.     As one former employee noted, the Company sat on vehicles for extended periods of time because they did not want to write them down or sell them at a lower price. This former

employee, who was a Vehicle Sales Manager in the Asset Management Division, stated that the large number of unsold used vehicles that sat on lots started in 2015 and was significantly different that it had been in the past and that "it got worse and worse and worse."

189.    Because the Company was overvaluing the trucks, Ryder would have taken a significant loss if they did try to sell them. Instead of realizing the loss, Ryder would instead try to find another consumer to whom to lease the same used truck.

190.    As the Company disclosed, as of February 12, 2016, its units held for sale at the end of the fourth quarter of 2015 had increased to 8,000, up from 5,500 units held for sale in the prior year, a 45% increase. By February 2017, the total Ryder units held for sale was still extremely high at 7,500 units, but this figure excluded 1,200 lease vehicles being "prepared for sale." Including those vehicles resulted in an increase of 700 vehicles versus the prior year. By February 2019, Ryder still had 6,900 units held for sale, which had increased by 900 units over the past year, and which was still 25% higher than the 5,500 units held for sale in 2014. By the end of the fourth quarter in 2019, Ryder's used vehicle inventory amounted to 9,400 vehicles, an increase of 71% compared with 2015.

191.    Numerous former Ryder employees brought up their concerns to Ryder executives, telling them that the Company was trying to sell its used vehicles at market prices far above what their true value was.  However, these concerns were consistently set aside by Ryder's most senior executives, who kept the prices for used vehicles too high.

192.    The Company also refused to make timely appropriate adjustments to its vehicles' residual values despite clear price-reducing circumstances. In particular, in 2010, the U.S. Environmental Protection Agency passed a set of historic emissions regulations meant to

substantially lower the amount of air pollution caused by large, commercial vehicles. Approximately 40% of the Company's fleet used vehicles with the Navistar International MaxxForce Engine, which was designed to comply with emission-reduction requirements. These engines were extremely unreliable and problematic which led to repeated breakdowns and engine failures making it difficult for the Company to sell trucks with Navistar International MaxxForce engines.

193.    According to former Ryder employees, as a matter of policy, the Company would indefinitely hold onto used vehicles instead of selling them to avoid—or at least postpone— recording a loss on the sale of the vehicle.

**Materially False and Misleading Statements**

*July 23, 2015 Press Release and Conference Call*

194.    On July 23, 2015, the Company issued a press release containing the Company's "record" financial results for the second quarter of 2015. The press release was also attached as an exhibit to a current report on Form 8-K filed with the SEC, which was signed by Defendant Garcia. The press release and Form 8-K announced "record . . . results" and reported the following financial results: (i) a comparable EPS from continuing operations of $1.65 (15% increase from 2014); (ii) an EPS from continuing operations of $1.61 (an increase of 13% from 2014); (iii) a 6% growth of operating revenue of $1.4 Billion; and (iv) a 14% increase in GAAP Earnings of $86.2 million. The Company also reported that its full-service lease results benefited from "lower depreciation associated with increased residual values."

195.    On that same day, the Company held a conference call with analysts and investors. During the call, Defendant Sanchez falsely assured investors that any headwind the Company

faced in its FMS segment from a decline in used vehicle sales "is being offset on the earnings line by the improvements that we've seen in depreciation expense."

### August 7, 2015 Form 10-Q

196.    On August 7, 2015, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2015 (the "2015 Q2 10-Q"). The 2015 Q2 10-Q was signed by Defendants Sanchez and Garcia.

197.    Attached to the 2015 Q2 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX Certifications") signed by Defendants Sanchez and Garcia, attesting to the accuracy of financial reporting in the 2015 Q2 10-Q. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

198.    In the 2015 Q2 10-Q, the Company announced, *inter alia*, the following financial results:

| Consolidated Condensed Statement of Earnings (in thousands, except per share amounts) | |
|---|---|
| Cost of lease and rentals | $531,308 |
| Net gains on vehicles | $33,237 |
| Earnings from continuing operations before income taxes | $133,447 |
| Net earnings | $85,917 |
| EPS – basic net earning | $1.61 |
| EPS – diluted net earnings | $1.59 |
| Consolidated Condensed Statement of Comprehensive Income (in thousands) | |
| Net earnings | $85,159 |
| Comprehensive income | $111,333 |
| Consolidated Condensed Balance Sheet (in thousands) | |
| Total assets | $10,638,264 |
| Total shareholders' equity | $1,913,439 |
| Operating property and equipment, net of accumulated depreciation | $707,886 |
| Retained earnings | $1,544,047 |

| Consolidated Condensed Statements of Cash Flows (in thousands) | |
|---|---|
| Net earnings | $137,948 |
| Depreciation expense | $546,699 |
| Net gains on used vehicle sales | $62,816 |

199.     The Company also announced that its lease and rental gross margin within its FMS segment had increased by 10%. The Company attributed this increase to the "benefits from improved residual values." The Company also reported that earnings before tax ("EBT") increased by 8% and attributed that increase to "$10 million of lower depreciation in the second quarter of 2015 due to residual value policy changes."

200.     Regarding the Company's controls and procedures, the 2015 Q2 10-Q provided that:

**Evaluation of Disclosure Controls and Procedures**
As of the end of the second quarter of 2015, we carried out an evaluation, under the supervision and with the participation of management, including Ryder's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Ryder's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934). Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that as of the end of the second quarter of 2015, Ryder's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) were effective.

**Changes in Internal Controls over Financial Reporting**
During the six months ended June 30, 2015, there were no changes in Ryder's internal control over financial reporting that have materially affected or are reasonably likely to materially affect such internal control over financial reporting.

*September 10, 2015 Conference*

201.     On September 10, 2015, during a presentation at the RBC Capital Markets Global Industrials Conference, Defendant Garcia stated that "we've been benefitting from the solid used truck environment because of an increase in residuals, which helped bring down depreciation expense, which more than offset any gains headwind that we saw." Defendant Garcia further stated

that "we probably haven't raised our residuals fast enough" and "we've been kind of conservative in that."

### October 22, 2015 Press Release, Form 10-Q, and Conference Call

202. On October 22, 2015, the Company issued a press release announcing, once again, "record" financial results. The press release was also attached as an exhibit to a current report on Form 8-K filed with the SEC, which was signed by Defendant Garcia. The press release and Form 8-K reported the following financial results: (i) an EPS from continuing operations of $1.70 (8% increase), (ii) a comparable EPS from continuing operations of $1.74 (7%); and (iii) a Comparable Earnings of $93.3 million (8% increase).

203. On the same day, the Company also filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2015 (the "2015 Q3 10-Q"). The 2015 Q3 10-Q was signed by Defendant Garcia.

204. Attached to the 2015 Q3 10-Q were SOX Certifications signed by Defendants Sanchez and Garcia, attesting to the accuracy of financial reporting in the 2015 Q3 10-Q. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclose.

205. In the 2015 Q3 10-Q, the Company announced, *inter alia*, the following financial results:

| Consolidated Condensed Statement of Earnings (in thousands, except per share amounts) | |
|---|---|
| Cost of lease and rentals | $550,541 |
| Net gains on vehicles | $29,294 |
| Earnings from continuing operations before income taxes | $139,900 |
| Net earnings | $90,619 |
| EPS – basic net earning | $1.71 |

| EPS – diluted net earnings | $1.69 |
|---|---|
| **Consolidated Condensed Statement of Comprehensive Income (in thousands)** | |
| Net earnings | $90,619 |
| Comprehensive income | $52,332 |
| **Consolidated Condensed Balance Sheet (in thousands)** | |
| Total assets | $10,820,186 |
| Total shareholders' equity | $1,952,064 |
| Operating property and equipment, net of accumulated depreciation | $712,169 |
| Retained earnings | $1,612,744 |
| **Consolidated Condensed Statements of Cash Flows (in thousands)** | |
| Net earnings | $228,567 |
| Depreciation expense | $838,100 |
| Net gains on used vehicle sales | $92,110 |

206.    In the 2015 Q3 10-Q, the Company also announced that its lease and rental gross margin within its FMS business segment grew by 8% and attributed the increase, in part, to "benefits from improved residual values." The Company also announced that EBT in the FMS segment increased by 5% because of "residual value policy changes."  The Company stated that its revenue "[r]esults benefitted from $10 million and $30 million of lower depreciation in the three and nine months ended September 30, 2015, respectively, due to residual value policy changes implemented January 1, 2015, driven by higher sales proceeds realized on used vehicles, as well as growth in average lease and rental fleet size."

207.    Regarding the Company's controls and procedures, the 2015 Q3 10-Q provided that:

**Evaluation of Disclosure Controls and Procedures**
As of the end of the third quarter of 2015, we carried out an evaluation, under the supervision and with the participation of management, including Ryder's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Ryder's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934). Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that as of the end of the third quarter of 2015, Ryder's disclosure controls and procedures (as

defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) were effective.

**Changes in Internal Controls over Financial Reporting**
During the nine months ended September 30, 2015, there were no changes in Ryder's internal control over financial reporting that have materially affected or are reasonably likely to materially affect such internal control over financial reporting.

208.   On the same day, October 22, 2015, the Company held a conference call with analysts and investors. During the call, Defendant Sanchez informed investors that the Company would realize a "benefit in depreciation due to higher residual values using our five-year rolling average methodology. We are currently conducting our annual residual value analysis and will provide an earnings benefit on this on our fourth quarter earnings call."

209.   Also on the call, an analyst asked whether "gains on sales down in the order of magnitude of $30 million" for the following year could be "offset . . . with residual value benefit." Defendant Sanchez responded that "if you think about a price decline in that 5% to 10% range, gains are going to drop let's say roughly $30 million . . . And what we're saying is that in that environment we would expect our residual value uptick to probably offset the decline that's going to occur in 2016."

*November 2015 Conferences*

210.   On November 3, 2015, during a presentation at the Goldman Sachs Industrial Conference, Defendant Sanchez was asked, "So if you have the environment where used trucks sales prices are coming down, can residual values still go up in that environment?" Defendant Sanchez answered, "Well, they can because of the way we calculate our residual values . . . Obviously we step back and take a look at it and make sure that we're still selling vehicles below— still selling vehicles above where our residual values are going to be set."

69

211.     Then, a week later, on November 10, 2015, Defendant Sanchez presented at the Robert W. Baird & Co. Industrials conference and explained how the Company determines residual value. He explained that the Ryder determines the residual value using a five-year average of Ryder's used truck sales prices and stated that "as used truck pricing has really gone up we've been lagging in that just because you don't want to overshoot the residual values." Defendant Sanchez reassured investors that "even in this environment I would expect that a five-year rolling average is going to cause an increase in residual values which is a benefit to depreciation expense" and "[s]o you kind of view used truck gains headwinds primarily offset by depreciation policy benefit."

212.     The next day, on November 11, 2015, the Company participated in the Stephens Fall Investment Conference. During the conference, Defendant Garcia stated that in 2016 Defendants "still would expect there to be a positive from residual values despite a declining environment [for used truck prices] here in the last few months" and told investors that even though used truck prices were declining, the Company was "still saying there's [] an opportunity to raise residuals in light of that."

### February 2, 2016 Press Release and Conference Call

213.     On February 2, 2016, the Company issued a press release once again announcing "record" financial results for the fourth quarter and full-year 105 results. The press release was also attached as an exhibit to a current report on Form 8-K filed with the SEC, which was signed by Defendant Garcia. The press release and Form 8-K reported the following financial results: (i) an EPS from continuing operations of $1.42, (ii) a comparable EPS from continuing operations of $1.66 (4% increase); (iii) a 7% growth in revenue of $1.4 Billion; (iv) a 10% increase in full-year

70

comparable EPS from continuing operations to $6.13; and (v) a 6% increase in full-year operating revenue of $5.6 Billion. The press release and Form 8-K also stated that the Company's full-service lease results benefited from "lower depreciation associated with increased residual values."

214.    On February 2, 2016, Defendant Sanchez told analysts on the Company's fourth quarter earnings call that the "[s]ignificant increases in used vehicle pricing over the past five years will benefit depreciation rates in 2016, as these results are blended into our vehicle residual calculation" and that "[t]hese benefits will partially offset lower expected gains on used vehicles sold." In describing the struggles from used vehicle sales and the forecasted decline in used vehicle pricing, Defendant Sanchez assured investors that "I feel really good about our ability to respond quickly to them.

215.    During the same call, in response to an analyst's question about how the expected decline in used vehicle pricing would affect the depreciation benefit going forward, Defendant Sanchez falsely stated that "[i]f we had a type of bleak environment, as we've painted here . . . you would be in a situation probably 2017 where things would be flat" and "[s]o there wouldn't be a depreciation policy movement one way or the other."

***February 11, 2016 BB&T Transportation Services Conference***

216.    On February 11, 2016, Defendants participated in the BB&T Transportation Services Conference, where Defendant Sanchez assured investors that "[w]e don't have a situation where we've got a bunch of vehicles that are at high residual values [and] have to be written down."

217.    The foregoing statement was materially false and/or misleading because  the Company's vehicles' residual values had already materially decreased at the time it was made. In fact, at the time the statement was made, Ryder had a significant number of used vehicles that had

been at the Ryder UTCs for a year or more. In particular, in February 2016, there were 300 trucks and 450 tractors that had already been at the UTCs for six months or more and needed to be written down.

### February 12, 2016 Form 10-K

218.   On February 12, 2016, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2015 (the "2015 10-K"). The 2015 10-K was signed by Defendants Sanchez, Garcia, Berra, Eck, Hagemann, Hassey, Hilton, Lundgren, Nieto, A. Smith, and E. Smith, Tookes. Attached to the 2015 10-K were SOX Certifications signed by Defendants Sanchez and Garcia, attesting to the accuracy of financial reporting in the 2015 10-K. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

219.   In the 2015 10-K, the Company announced, *inter alia*, the following financial results for the full fiscal year 2015:

| Consolidated Condensed Statement of Earnings (in thousands, except per share amounts) (full year) | |
|---|---|
| Cost of lease and rentals | $2,153,450 |
| Net gains on vehicles | $117,809 |
| Earnings from continuing operations before income taxes | $469,215 |
| Net earnings | $304,768 |
| EPS – basic net earning | $5.78 |
| EPS – diluted net earnings | $5.73 |
| Consolidated Condensed Statement of Comprehensive Income (in thousands) | |
| Net earnings | $304,768 |
| Comprehensive income | $212,303 |
| Consolidated Condensed Balance Sheet (in thousands) | |
| Total assets | $10,967,809 |
| Total shareholders' equity | $1,987,111 |
| Operating property and equipment, net of accumulated depreciation | $714,970 |
| Retained earnings | $1,667,080 |

| Consolidated Condensed Statements of Cash Flows (in thousands) | |
|---|---|
| Net earnings | $304,768 |
| Depreciation expense | $1,139,922 |
| Net gains on used vehicle sales | $117,809 |

220.    In the 2015 10-K, the Company reported that its lease and rental gross margin within its FMS business segment increased 7% in 2015—attributing the increase, in part, to "benefits from improved vehicle residual values." The 2015 Form 10-K also stated that full-service lease results benefited from "lower depreciation associated with increased residual values." The 2015 10-K also reported that depreciation expense increased by 8%, but that it was "partially offset by $40 million . . . from changes in residual values."

221.    In a section titled "Management's Report on Internal Control Over Financial Reporting," the 2015 10-K provided, in relevant part, that:

> Management assessed the effectiveness of Ryder's internal control over financial reporting as of December 31, 2015. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in "Internal Control — Integrated Framework (2013)." Based on our assessment and those criteria, management determined that Ryder maintained effective internal control over financial reporting as of December 31, 2015.

### *April 26, 2016 Press Release & Form 10-Q*

222.    On April 26, 2016, the Company to issue a press release announcing its financial and operating results for the fiscal quarter ended March 31, 2016. The press release, which Ryder also filed with the SEC a Current Report on Form 8-K, stated that the Company's full-service lease results benefited from "lower depreciation associated with increased residual values."

223.    Also on April 26, 2016, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2016 (the "2016 Q1 10-Q").  The 2016 Q1 10-Q was signed by Defendants Sanchez and Garcia.

224.    Attached to the 2016 Q1 10-Q were SOX Certifications signed by Defendants Sanchez and Garcia, attesting to the accuracy of financial reporting in the 2016 Q1 10-Q. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

225.    In the 2016 Q1 10-Q, the Company announced, *inter alia*, the following financial results for the first quarter of 2016:

| Consolidated Condensed Statement of Earnings (in thousands, except per share amounts) | |
|---|---|
| Cost of lease and rentals | $552,490 |
| Net gains on vehicles | $19,129 |
| Earnings from continuing operations before income taxes | $88,708 |
| Net earnings | $55,794 |
| EPS – basic net earning | $1.05 |
| EPS – diluted net earnings | $1.04 |
| Consolidated Condensed Statement of Comprehensive Income (in thousands) | |
| Net earnings | $55,794 |
| Comprehensive income | $74,193 |
| Consolidated Condensed Balance Sheet (in thousands) | |
| Total assets | $11,054,530 |
| Total shareholders' equity | $2,045,318 |
| Operating property and equipment, net of accumulated depreciation | $717,444 |
| Retained earnings | $1,700,816 |
| Consolidated Condensed Statements of Cash Flows (in thousands) | |
| Net earnings | $55,794 |
| Depreciation expense | $287,170 |
| Net gains on used vehicle sales | $19,129 |

226.    In the 2016 Q1 10-Q, Ryder also reported that the Company's lease and rental gross margin within its FMS business segment increased 2%--attributing the increase in margin, in part, to "benefits from improved residual values."  The Company also stated that "[f]ull service lease and commercial rental results benefited from approximately $9 million of lower depreciation in the first quarter of 2016 due to residual value changes implemented January 1, 2016."

227.    Regarding the Company's controls and procedures, the 2016 Q1 10-Q provided that:

> **Evaluation of Disclosure Controls and Procedures**
> As of the end of the first quarter of 2016, we carried out an evaluation, under the supervision and with the participation of management, including Ryder's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Ryder's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934). Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that as of the end of the first quarter of 2016, Ryder's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) were effective.
>
> **Changes in Internal Controls over Financial Reporting**
> During the three months ended March 31, 2016, there were no changes in Ryder's internal control over financial reporting that have materially affected or are reasonably likely to materially affect such internal control over financial reporting.

228.    The Investor Presentation that the Company released in connection to Ryder's first quarter 2016 earnings conference call, stated that "Lease results benefited from fleet growth and vehicle residual value benefits."

### *May 19, 2016 Conference Call*

229.    On May 19, 2016, Ryder held a conference call with analysts and investors as part of Ryder's 2016 Investor Day. During the conference call, Defendant Cooke, Ryder's President of

Global FMS, stated that Ryder is "the largest retailer of used trucks in the industry, and so we have a higher residual as a result."

230.    Also on the call, Defendant Garcia was asked whether the Company anticipated the residual value to remain the same in the next few years in light of the decline in used truck pricing, and Defendant Garcia stated "[y]es."

### *July 27, 2016 Press Release, Form 10-Q, and Conference Call*

231.    On July 27, 2016, the Company issued a press release announcing financial results for the second quarter of 2016. The press release was also attached as an exhibit to a current report on Form 8-K filed with the SEC, which was signed by Defendant Garcia. The press release and Form 8-K reported the following financial results: (i) GAAP Earnings of $116.8 and Comparable (non-GAAP) Earnings of $132.0 million; (ii) GAAP EPS from Continuing Operations of $1.38; and (iii) Comparable EPS from continuing operations of $1.56. The press release and Form 8-K also stated that although EBT in the FMS segment were down 9% (driven in part by lower used vehicle sales), the Company's "[f]ull-service lease and commercial rental results also benefited from lower depreciation associated with increased residual values."

232.    On the same day, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2016 (the "2016 Q2 10-Q"). The 2016 Q2 10-Q was signed by Defendants Sanchez and Garcia. Attached to the 2016 Q2 10-Q were SOX Certifications signed by Defendants Sanchez and Garcia, attesting to the accuracy of financial reporting in the 2016 Q2 10-Q. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

233.     The 2016 Q2 10-Q reported that EBT in the FMS business segment were down 9% but stated that the Company's full-service lease and commercial rental results "benefited from approximately $9 million in the second quarter and $17 million in the first half of 2016 due to residual value changes implemented January 1, 2016."

234.     In the 2016 Q2 10-Q, the Company announced, *inter alia*, the following financial results for the second quarter of 2016:

| Consolidated Condensed Statement of Earnings (in thousands, except per share amounts) | |
|---|---|
| Cost of lease and rentals | $555,302 |
| Net gains on vehicles | ($12,000) |
| Earnings from continuing operations before income taxes | $116,779 |
| Net earnings | $73,750 |
| EPS – basic net earning | $1.39 |
| EPS – diluted net earnings | $1.38 |
| Consolidated Condensed Statement of Comprehensive Income (in thousands) | |
| Net earnings | $73,750 |
| Comprehensive income | $35,431 |
| Consolidated Condensed Balance Sheet (in thousands) | |
| Total assets | $11,136,127 |
| Total shareholders' equity | $2,047,098 |
| Operating property and equipment, net of accumulated depreciation | $741,022 |
| Retained earnings | $1,736,839 |
| Consolidated Condensed Statements of Cash Flows (in thousands) | |
| Net earnings | $129,544 |
| Depreciation expense | $581,043 |
| Net gains on used vehicle sales | $31,129 |

235.     Regarding the Company's controls and procedures, the 2016 Q2 10-Q provided that:

**Evaluation of Disclosure Controls and Procedures**
As of the end of the second quarter of 2016, we carried out an evaluation, under the supervision and with the participation of management, including Ryder's Chief

Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Ryder's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934). Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that as of the end of the second quarter of 2016, Ryder's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) were effective.

**Changes in Internal Controls over Financial Reporting**
During the six months ended June 30, 2016, there were no changes in Ryder's internal control over financial reporting that have materially affected or are reasonably likely to materially affect such internal control over financial reporting.

236.    Also on the same day, the Company held a conference to discuss with analysts and investors the Company's second quarter 2016 earnings. During it, Defendant Garcia once again told analysts that Ryder expected residual value to be flat, explaining that based on "what we're seeing in the current marketplace, . . . I wouldn't envision an increase or decrease in residual values out over the next four, five years."

### October 25, 2016 Press Release and Form 10-Q

237.    On October 25, 2016, the Company issued a press release announcing its financial and operating results for the third quarter of 2016. The press release, which Ryder also filed with the SEC as an Exhibit to a Current Report on Form 8-K and which was signed by Defendant Garcia, reported the following financial information: (i) GAAP Earnings of $131.7 million and Comparable Earnings of $138.9 million; (ii) GAAP EPS from Continuing Operations of $1.59; and (iii) Comparable EPS from Continuing Operations of $1.67.

238.    The press release and Form 8-K also stated that the Company's EBT in the FMS business segment were down 11%, driven, in part, by lower results in used vehicle sales. However, the press release stated that the Company's full-service lease and commercial rental results "benefited from lower depreciation associated with increased residual values."

239.    On the same day, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2016 (the "2016 Q3 10-Q"). The 2016 Q3 10-Q was signed by Defendants Sanchez and Garcia. Attached to the 2016 Q3 10-Q were SOX Certifications signed by Defendants Sanchez and Garcia, attesting to the accuracy of financial reporting in the 2016 Q3 10-Q. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

240.    In the 2016 Q3 10-Q, the Company announced, *inter alia*, the following financial results for the second quarter of 2016:

| Consolidated Condensed Statement of Earnings (in thousands, except per share amounts) | |
|---|---|
| Cost of lease and rentals | $557,901 |
| Net gains on vehicles | $1,873 |
| Earnings from continuing operations before income taxes | $131,698 |
| Net earnings | $84,752 |
| EPS – basic net earning | $1.60 |
| EPS – diluted net earnings | $1.59 |
| Consolidated Condensed Statement of Comprehensive Income (in thousands) | |
| Net earnings | $84,752 |
| Comprehensive income | $69,960 |
| Consolidated Condensed Balance Sheet (in thousands) | |
| Total assets | $11,108,773 |
| Total shareholders' equity | $2,097,041 |
| Operating property and equipment, net of accumulated depreciation | $740,375 |
| Retained earnings | $1,795,445 |
| Consolidated Condensed Statements of Cash Flows (in thousands) | |
| Net earnings | $214,296 |
| Depreciation expense | $878,173 |
| Net gains on used vehicle sales | $33,002 |

241.    The 2016 Q3 10-Q also reported that the EBT in the FMS segment were down by 11% but stated that "[f]ull service lease and commercial rental results benefited from

79

approximately $9 million of lower depreciation in the third quarter and $26 million in the nine

months ended September 30, 2016, due to residual value changes implemented January 1, 2016."

242.    Regarding the Company's controls and procedures, the 2016 Q3 10-Q provided

that:

> **Evaluation of Disclosure Controls and Procedures**
> As of the end of the third quarter of 2016, we carried out an evaluation, under the supervision and with the participation of management, including Ryder's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Ryder's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934). Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that as of the end of the third quarter of 2016, Ryder's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) were effective.
>
> **Changes in Internal Controls over Financial Reporting**
> During the nine months ended September 30, 2016, there were no changes in Ryder's internal control over financial reporting that have materially affected or are reasonably likely to materially affect such internal control over financial reporting.

### November 8, 2016 Conference

243.    On November 8, 2016, during a presentation at the Stephens Fall Investor

Conference, Defendant Garcia asserted that the drop in used truck prices "will not result in us

changing residuals right now."

### February 2, 2017 Press Release

244.    On February 2, 2017, Ryder issued a press release announcing its financial and

operating results for the fourth quarter 2016. The press release, which Ryder also filed with the

SEC as an Exhibit to a Current Report on Form 8-K that was signed by Defendant Garcia, reported

the following financial information: (i) GAAP Earnings of $69.2 million and Comparable Earnings

of $82.3 million; (ii) GAAP EPS from Continuing Operations of $0.92; and (iii) Comparable EPS from Continuing Operations of $1.07.

### February 14, 2017 Form 10-K

245.    On February 14, 2017, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2016 (the "2016 10-K"). The 2016 10-K was signed by Defendants Sanchez, Garcia, Berra, Eck, Hagemann, Hassey, Hilton, Lundgren, Nieto, A. Smith, E. Smith, and Tookes.  Attached to the 2016 10-K were SOX Certifications signed by Defendants Sanchez and Garcia, attesting to the accuracy of financial reporting in the 2016 10-K. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

246.    In the 2016 10-K, the Company announced, *inter alia*, the following financial results for the full fiscal year of 2016:

| Consolidated Condensed Statement of Earnings (in thousands, except per share amounts) (full year) | |
|---|---|
| Cost of lease and rentals | $2,234,284 |
| Net gains on vehicles | $972 |
| Earnings from continuing operations before income taxes | $406,381 |
| Net earnings | $262,477 |
| EPS – basic net earning | $4.94 |
| EPS – diluted net earnings | $4.90 |
| Consolidated Condensed Statement of Comprehensive Income (in thousands) | |
| Net earnings | $262,477 |
| Comprehensive income | $141,180 |
| Consolidated Condensed Balance Sheet (in thousands) | |
| Total assets | $10,902,454 |
| Total shareholders' equity | $2,052,275 |
| Operating property and equipment, net of accumulated depreciation | $745,870 |
| Retained earnings | $1,827,026 |
| Consolidated Condensed Statements of Cash Flows (in thousands) | |
| Net earnings | $262,477 |

| Depreciation expense | $1,187,050 |
|---|---|
| Net gains on used vehicle sales | $972 |

247.     In the 2016 10-K, the Company reported that depreciation expense increased 6% in 2016 and increased 7% in 2015 but stated that "[t]he increases in both years were partially offset by $35 million and $40 million, respectively, from increases in residual values."  The Company also stated that "[f]ull service lease and commercial rental results benefited from lower depreciation of $35 million due to residual value changes implemented January 1, 2016."

248.     In a section titled "Management's Report on Internal Control Over Financial Reporting," the 2016 10-K provided, in relevant part, that:

> Management assessed the effectiveness of Ryder's internal control over financial reporting as of December 31, 2016. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in "Internal Control — Integrated Framework (2013)." Based on our assessment and those criteria, management determined that Ryder maintained effective internal control over financial reporting as of December 31, 2016.

249.     The same day, the Company participated in the Stifel Transportation & Logistics Conference.  During that conference, an analyst asked the Company whether it would be revisiting its residual values, and Defendant Garcia stated that "most likely, it's going to go down a little bit."

### April 25, 2017 Press Release and Form 10-Q

250.     On April 25, 2017, the Company issued a press release announcing its financial and operating results for the first quarter of 2017. The press release, which Ryder also filed with the SEC as an Exhibit to a Current Report on Form 8-K, was signed by Defendant Garcia.  The press release and Form 8-K reported the following financial information: (i) "Record Q1 Total Revenue

Grows 7% to $1.7 Billion;" (ii) "Record Q1 Operating Revenue (non-GAAP) up 3%;" (iii) GAAP

EPS from Continuing Operations of $0.71; and (iii) Comparable EPS from Continuing Operations

of $0.82. The press release and Form 8-K noted that the GAAP EPS from continuing operations

was lower as a result of lower used vehicle sales.

251.    Also on April 25, 2017, the Company filed its quarterly report on Form 10-Q with

the SEC for the fiscal quarter ended March 31, 2017 (the "2017 Q1 10-Q"). The 2017 Q1 10-Q

was signed by Defendants Sanchez and Garcia. Attached to the 2017 Q1 10-Q were SOX

Certifications signed by Defendants Sanchez and Garcia, attesting to the accuracy of financial

reporting in the 2017 Q1 10-Q. The SOX Certifications further attested that all fraud and any

material changes to the Company's internal control over financial reporting had been disclosed.

252.    In the 2017 Q1 10-Q, the Company announced, *inter alia*, the following financial

results for the first quarter of 2017:

| Consolidated Condensed Statement of Earnings (in thousands, except per share amounts) | |
|---|---|
| Cost of lease and rentals | $578,762 |
| Net gains on vehicles | $780 |
| Earnings from continuing operations before income taxes | $59,956 |
| Net earnings | $38,279 |
| EPS – basic net earning | $0.72 |
| EPS – diluted net earnings | $0.71 |
| Consolidated Condensed Statement of Comprehensive Income (in thousands) | |
| Net earnings | $38,149 |
| Comprehensive income | $58,955 |
| Consolidated Condensed Balance Sheet (in thousands) | |
| Total assets | $10,973,807 |
| Total shareholders' equity | $2,079,796 |
| Operating property and equipment, net of accumulated depreciation | $754,307 |
| Retained earnings | $1,829,114 |

| Consolidated Condensed Statements of Cash Flows (in thousands) | |
|---|---|
| Net earnings | $38,149 |
| Depreciation expense | $311,149 |
| Net gains on used vehicle sales | $780 |

253.    Regarding the Company's controls and procedures, the 2017 Q1 10-Q provided

that:

**Evaluation of Disclosure Controls and Procedures**
As of the end of the first quarter of 2017, we carried out an evaluation, under the supervision and with the participation of management, including Ryder's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Ryder's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934). Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that as of the end of the first quarter of 2017, Ryder's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) were effective.

**Changes in Internal Controls over Financial Reporting**
During the three months ended March 31, 2017, there were no changes in Ryder's internal control over financial reporting that have materially affected or are reasonably likely to materially affect such internal control over financial reporting.

*July 26, 2017 Press Release and Form 10-Q*

254.    On July 26, 2017, the Company issued a press release announcing its financial and

operating results for the second quarter of 2017. The press release, which Ryder also filed with the

SEC as an Exhibit to a Current Report on Form 8-K, was signed by Defendant Garcia.  The press

release and Form 8-K reported the following financial information: (i) GAAP Earnings of $80.7

million; (ii) Comparable Earnings of $84.7 million; (iii) GAAP EPS from Continuing Operations

of $0.97; and (iii) Comparable EPS from Continuing Operations of $1.00.  The press release and

Form 8-K noted that the GAAP EPS from continuing operations, and that it was "[p]rimarily

[i]mpacted" by lower used vehicle sales.

255.    Also on July 26, 2017, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2017 (the "2017 Q2 10-Q"). The 2017 Q2 10-Q was signed by Defendants Sanchez and Garcia. Attached to the 2017 Q2 10-Q were SOX Certifications signed by Defendants Sanchez and Garcia, attesting to the accuracy of financial reporting in the 2017 Q2 10-Q. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

256.    In the 2017 Q2 10-Q, the Company announced, *inter alia*, the following financial results for the second quarter of 2017:

| Consolidated Condensed Statement of Earnings (in thousands, except per share amounts) | |
| --- | --- |
| Cost of lease and rentals | $578,389 |
| Net gains on vehicles | $15,322 |
| Earnings from continuing operations before income taxes | $80,692 |
| Net earnings | $50,816 |
| EPS – basic net earning | $0.96 |
| EPS – diluted net earnings | $0.96 |
| Consolidated Condensed Statement of Comprehensive Income (in thousands) | |
| Net earnings | $50,816 |
| Comprehensive income | $83,822 |
| Consolidated Condensed Balance Sheet (in thousands) | |
| Total assets | $11,124,784 |
| Total shareholders' equity | $2,1006,099 |
| Operating property and equipment, net of accumulated depreciation | $762,404 |
| Retained earnings | $1,827,139 |
| Consolidated Condensed Statements of Cash Flows (in thousands) | |
| Net earnings | $88,965 |
| Depreciation expense | $621,020 |
| Net gains on used vehicle sales | $14,542 |

257.    Regarding the Company's controls and procedures, the 2017 Q2 10-Q provided that:

**Evaluation of Disclosure Controls and Procedures**

As of the end of the second quarter of 2017, we carried out an evaluation, under the supervision and with the participation of management, including Ryder's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Ryder's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934). Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that as of the end of the second quarter of 2017, Ryder's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) were effective.

**Changes in Internal Controls over Financial Reporting**

During the six months ended June 30, 2017, there were no changes in Ryder's internal control over financial reporting that have materially affected or are reasonably likely to materially affect such internal control over financial reporting.

### *October 25, 2017 Press Release and Form 10-Q*

258.   On October 25, 2017, the Company issued a press release announcing its financial and operating results for the first quarter of 2017. The press release, which Ryder also filed with the SEC as an Exhibit to a Current Report on Form 8-K, was signed by Defendant Garcia.  The press release and Form 8-K reported the following financial information: (i) GAAP Earnings of $94.2 million; (ii) Comparable Earnings of $111 million; (iii) GAAP EPS from Continuing Operations of $1.11; and (iii) Comparable EPS from Continuing Operations of $1.33.

259.   Also on October 25, 2017, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2017 (the "2017 Q3 10-Q"). The 2017 Q3 10-Q was signed by Defendants Sanchez and Garcia. Attached to the 2017 Q3 10-Q were SOX Certifications signed by Defendants Sanchez and Garcia, attesting to the accuracy of financial reporting in the 2017 Q3 10-Q. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

260. In the 2017 Q3 10-Q, the Company announced, *inter alia*, the following financial results for the third quarter of 2017:

| Consolidated Condensed Statement of Earnings (in thousands, except per share amounts) | |
|---|---|
| Cost of lease and rentals | $588,626 |
| Net gains on vehicles | $2,727 |
| Earnings from continuing operations before income taxes | $94,343 |
| Net earnings | $58,913 |
| EPS – basic net earning | $1.11 |
| EPS – diluted net earnings | $1.11 |
| Consolidated Condensed Statement of Comprehensive Income (in thousands) | |
| Net earnings | $58,623 |
| Comprehensive income | $92,029 |
| Consolidated Condensed Balance Sheet (in thousands) | |
| Total assets | $11,258,974 |
| Total shareholders' equity | $2,175,064 |
| Operating property and equipment, net of accumulated depreciation | $778,879 |
| Retained earnings | $1,855,806 |
| Consolidated Condensed Statements of Cash Flows (in thousands) | |
| Net earnings | $147,588 |
| Depreciation expense | $932,772 |
| Net gains on used vehicle sales | ($11,815) |

261. Regarding the Company's controls and procedures, the 2017 Q3 10-Q provided that:

**Evaluation of Disclosure Controls and Procedures**

As of the end of the third quarter of 2017, we carried out an evaluation, under the supervision and with the participation of management, including Ryder's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Ryder's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934). Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that as of the end of the third quarter of 2017, Ryder's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) were effective.

**Changes in Internal Controls over Financial Reporting**

During the three months ended September 30, 2017, there were no changes in Ryder's internal control over financial reporting that have materially affected or are reasonably likely to materially affect such internal control over financial reporting.

### *February 16, 2018 Press Release and Conference Call*

262.    On February 16, 2018, the Company issued a press release announcing its financial and operating results for the fourth quarter of 2017. The press release, which Ryder also filed with the SEC as an Exhibit to a Current Report on Form 8-K, was signed by Defendant Garcia.  The press release and Form 8-K reported the following financial information: (i) GAAP Earnings of $78.8 million; (ii) Comparable Earnings of $104.5 million; (iii) GAAP EPS from Continuing Operations of $12.10 (which included a one-time net benefit from 2017 tax reform); and (iii) Comparable EPS from Continuing Operations of $1.37.

263.    On the same day, the Company held a conference call with analysts and investors to discuss the Company's fourth quarter and full-year 2017 earnings.  One analyst asked "what is it that's driving the change in residuals and the additional depreciation that you're taking?  Is it something specific with the vintage of equipment that you're seeing? Or is it the expectation as you look out and the supply that's coming into—potentially coming into the market here into '18? If you can just give us a sense of maybe why some of the fundamentals seem a little bit better, but you are still dealing with the change in the residuals and the incremental depreciation." Defendant Garcia responded that, based on Ryder's expectations for used truck pricing, depreciation will be at a "lower level than what we had seen this year."

### *February 20, 2018 Form 10-K*

264.    On February 20, 2018, the Company also filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K was

signed by Defendants Sanchez, Garcia, Berra, Eck, Hagemann, Hilton, Lundgren, Nieto, A. Smith, E. Smith, and Tookes.  Attached to the 2017 10-K were SOX Certifications signed by Defendants Sanchez and Garcia, attesting to the accuracy of financial reporting in the 2017 10-K. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

265.    In the 2017 10-K, the Company announced, *inter alia*, the following financial results for the full fiscal year of 2017:

| Consolidated Condensed Statement of Earnings (in thousands, except per share amounts) (full year) | |
| --- | --- |
| Cost of lease and rentals | $2,355,043 |
| Net gains on vehicles | $17,241 |
| Earnings from continuing operations before income taxes | $313,786 |
| Net earnings | $790,558 |
| EPS – basic net earning | $14.97 |
| EPS – diluted net earnings | $14.87 |
| Consolidated Condensed Statement of Comprehensive Income (in thousands) | |
| Net earnings | $790,558 |
| Comprehensive income | $917,089 |
| Consolidated Condensed Balance Sheet (in thousands) | |
| Total assets | $11,452,231 |
| Total shareholders' equity | $2,835,016 |
| Operating property and equipment, net of accumulated depreciation | $776,704 |
| Retained earnings | $2,465,022 |
| Consolidated Condensed Statements of Cash Flows (in thousands) | |
| Net earnings | $790,558 |
| Depreciation expense | $1,255,175 |
| Net gains on used vehicle sales | $17,241 |

266.    In the 2017 10-K, the Company reported that "lease and rental gross margin . . . decreased by 3% and gross margin as a percentage of revenue decreased to 30% in 2016, due to

lower commercial rental demand, partially offset by lease fleet growth, as well as benefits from improved residual values."

267.    The 2017 10-K also stated that "ChoiceLease and commercial rental results benefited from lower depreciation of $35 million due to residual value changes implemented on January 1, 2016."

268.    In a section titled "Management's Report on Internal Control Over Financial Reporting," the 2017 10-K provided, in relevant part, that:

> Management assessed the effectiveness of Ryder's internal control over financial reporting as of December 31, 2017. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in "Internal Control — Integrated Framework (2013)." Based on our assessment and those criteria, management determined that Ryder maintained effective internal control over financial reporting as of December 31, 2017.

***February 22, 2018 Conference***

269.    On February 22, 2018, during a presentation at the Citi Global Industrials Conference, Defendant Sanchez applauded the success of the Company despite certain challenges and stated that "[i]f you were to take out the negative impact of used trucks and depreciation, we'd be up 15% on an—from an earnings standpoint."

***March 19, 2018 Proxy Statement***

270.    On March 19, 2018, the Company filed a Schedule 14A with the SEC (the "2018 Proxy Statement"). Defendants Berra, Eck, Hagemann, Hilton, Lundgren, Nieto, Nord, Sanchez,

A. Smith, E. Smith, Stockton, and Tookes solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[2]

271.    With respect to the Company's Code of Conduct, the 2018 Proxy Statement stated that it "appl[ies] to our officers, employees and Board members and cover all areas of professional conduct including conflicts of interest, confidentiality, compliance with law and mechanisms to report known or suspected wrongdoing."

272.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

273.    The Individual Defendants caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

274.    The 2018 Proxy Statement also called for shareholder approval of, among other things: (1) the election of twelve directors; (2) ratification of the Company's independent auditors; (3) advisory vote to approve named executive officer compensation; (4) amendments to the

---

[2] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

Company's Restated Articles of Incorporation and By-Laws to authorize shareholder action by written consent; and (5) a shareholder proposal on simple majority voting.

275.     The 2018 Proxy Statement was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) throughout the Relevant Period, nearly all of Ryder's used vehicles were selling at prices significantly below the residual values that the Company had designated for each vehicle; (2) as a result, Ryder had a large number of vehicles that were recorded at high residual values that needed to be written down because the residual values of the Company's used vehicles had materially decreased and its depreciation expense had materially increased beginning at least as early as mid-2015; (3) the Company failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense, which resulted in a material overstatement of the Company's net earnings, earnings per share, the value of its operating property and equipment, its total assets, retained earnings, and total shareholder's equity; (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### April 24, 2018 Press Release and Conference Call

276.     On April 24, 2018, Ryder issued a press release announcing its financial and operating results for the first quarter of 2018. The press release, which Ryder also filed with the SEC as an Exhibit to a Current Report on Form 8-K, was signed by Defendant Garcia.  The press release and Form 8-K reported the following financial information: (i) GAAP Earnings of $48.1

million; (ii) Comparable Earnings of $65.1 million; (iii) GAAP EPS from Continuing Operations of $0.64; and (iii) Comparable EPS from Continuing Operations of $0.91.

277.     Also on April 24, 2018, the Company held a conference call with analysts and investors to discuss first quarter 2018 earnings.   During the call, in response to an analyst's question about what the Company would adjust the residual values to in 2019, Defendant Garcia stated that "[i]t could be a little bit less than what it was this year" and guided analysts to "model[] in that $30 million to $40 million range." Defendant Sanchez also stated that "the earnings in the rest of the business is going to more than offset the earnings headwind from used vehicle sales and depreciation."

### *May 2, 2018 Press Release, Conference Call, and Form 10-Q*

278.     On May 2, 2018, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2018 (the "2018 Q1 10-Q"). The 2018 Q1 10-Q was signed by Defendants Sanchez and Garcia. Attached to the 2018 Q1 10-Q were SOX Certifications signed by Defendants Sanchez and Garcia, attesting to the accuracy of financial reporting in the 2018 Q1 10-Q. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

279.     In the 2018 Q1 10-Q, the Company announced, *inter alia*, the following financial results for the first quarter of 2018:

| Consolidated Condensed Statement of Earnings (in thousands, except per share amounts) | |
|---|---|
| Cost of lease and rentals | $619,207 |
| Net gains on vehicles | $7,409 |
| Earnings from continuing operations before income taxes | $48,100 |
| Net earnings | $33,505 |
| EPS – basic net earning | $0.64 |

| EPS – diluted net earnings | $0.64 |
|---|---|
| **Consolidated Condensed Statement of Comprehensive Income (in thousands)** | |
| Net earnings | $33,505 |
| Comprehensive income | $51,003 |
| **Consolidated Condensed Balance Sheet (in thousands)** | |
| Total assets | $11,736,157 |
| Total shareholders' equity | $2,858,815 |
| Operating property and equipment, net of accumulated depreciation | $790,476 |
| Retained earnings | $2,468,005 |
| **Consolidated Condensed Statements of Cash Flows (in thousands)** | |
| Net earnings | $33,505 |
| Depreciation expense | $336,745 |
| Net gains on used vehicle sales | $7,409 |

280. Regarding the Company's controls and procedures, the 2018 Q1 10-Q provided that:

**Evaluation of Disclosure Controls and Procedures**
As of the end of the first quarter of 2018, we carried out an evaluation, under the supervision and with the participation of management, including Ryder's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Ryder's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934). Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that as of the end of the first quarter of 2018, Ryder's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) were effective.

**Changes in Internal Controls over Financial Reporting**
During the three months ended March 31, 2018, there were no changes in Ryder's internal control over financial reporting that have materially affected or are reasonably likely to materially affect such internal control over financial reporting.

***July 25, 2018 Press Release, Conference Call, and Form 10-Q***

281. On July 25, 2018, the Company issued a press release announcing its financial and operating results for the second quarter of 2018. The press release, which Ryder also filed with the SEC as an Exhibit to a Current Report on Form 8-K, was signed by Defendant Garcia. The press

release and Form 8-K reported the following financial information: (i) GAAP Earnings of $98.3million; (ii) Comparable Earnings of $102.8 million; (iii) GAAP EPS from Continuing Operations of $0.82; and (iii) Comparable EPS from Continuing Operations of $1.42.

282.    On the same day, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2018 (the "2018 Q2 10-Q"). The 2018 Q2 10-Q was signed by Defendants Sanchez and Garcia. Attached to the 2018 Q2 10-Q were SOX Certifications signed by Defendants Sanchez and Garcia, attesting to the accuracy of financial reporting in the 2018 Q2 10-Q. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

283.    In the 2018 Q2 10-Q, the Company announced, *inter alia*, the following financial results for the second quarter of 2018:

| Consolidated Condensed Statement of Earnings (in thousands, except per share amounts) | |
|---|---|
| Cost of lease and rentals | $636,359 |
| Net gains on vehicles | ($6,013) |
| Earnings from continuing operations before income taxes | $98,283 |
| Net earnings | $42,258 |
| EPS – basic net earning | $0.80 |
| EPS – diluted net earnings | $0.80 |
| Consolidated Condensed Statement of Comprehensive Income (in thousands) | |
| Net earnings | $42,258 |
| Comprehensive income | $4,861 |
| Consolidated Condensed Balance Sheet (in thousands) | |
| Total assets | $12,228,866 |
| Total shareholders' equity | $2,841,403 |
| Operating property and equipment, net of accumulated depreciation | $823,893 |
| Retained earnings | $2,580,262 |
| Consolidated Condensed Statements of Cash Flows (in thousands) | |
| Net earnings | $75,763 |
| Depreciation expense | $681,285 |

| Net gains on used vehicle sales | (13,422) |
|---|---|

284.    Regarding the Company's controls and procedures, the 2018 Q2 10-Q provided

that:

**Evaluation of Disclosure Controls and Procedures**
As of the end of the second quarter of 2018, we carried out an evaluation, under the supervision and with the participation of management, including Ryder's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Ryder's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934). Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that as of the end of the second quarter of 2018, Ryder's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) were effective.

**Changes in Internal Controls over Financial Reporting**
During the six months ended June 30, 2018, there were no changes in Ryder's internal control over financial reporting that have materially affected or are reasonably likely to materially affect such internal control over financial reporting.

285.    Also on July 25, 2018, the Company held a conference call with analysts and

investors to discuss second quarter 2018 earnings. During the call, an analyst asked if "there's any

renewed focus on accelerating the growth within DTS and SCS" "given some of the headwinds in

recent years with some of the cyclical elements." Defendant Sanchez responded, "you can look at

ChoiceLease today as being more derisked than it has historically" as "we've lowered that residual

to generally the current levels that we're seeing today as opposed to using our normal rolling 5-

year average."

*October 26, 2018 Press Release, Conference Call, and Form 10-Q*

286.    On October 26, 2018, the Company issued a press release announcing its financial

and operating results for the third quarter of 2018. The press release, which Ryder also filed with

the SEC as an Exhibit to a Current Report on Form 8-K, was signed by Defendant Garcia.  The

press release and Form 8-K reported the following financial information: (i) GAAP Earnings of $116.1 million; (ii) Comparable Earnings of $117.6 million; (iii) GAAP EPS from Continuing Operations of $1.69; and (iii) Comparable EPS from Continuing Operations of $1.64.

287.    On the same day, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2018 (the "2018 Q3 10-Q"). The 2018 Q3 10-Q was signed by Defendants Sanchez and Garcia. Attached to the 2018 Q3 10-Q were SOX Certifications signed by Defendants Sanchez and Garcia, attesting to the accuracy of financial reporting in the 2018 Q3 10-Q. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

288.    In the 2018 Q3 10-Q, the Company announced, *inter alia*, the following financial results for the third quarter of 2018:

| Consolidated Condensed Statement of Earnings (in thousands, except per share amounts) | |
|---|---|
| Cost of lease and rentals | $649,407 |
| Net gains on vehicles | ($3,012) |
| Earnings from continuing operations before income taxes | $116,140 |
| Net earnings | $88,751 |
| EPS – basic net earning | $1.69 |
| EPS – diluted net earnings | $1.68 |
| Consolidated Condensed Statement of Comprehensive Income (in thousands) | |
| Net earnings | $88,751 |
| Comprehensive income | $100,571 |
| Consolidated Condensed Balance Sheet (in thousands) | |
| Total assets | $12,684,305 |
| Total shareholders' equity | $2,918,398 |
| Operating property and equipment, net of accumulated depreciation | $826,183 |
| Retained earnings | $2,632,589 |
| Consolidated Condensed Statements of Cash Flows (in thousands) | |
| Net earnings | $164,514 |
| Depreciation expense | $1,028,491 |

| Net gains on used vehicle sales | $16,434 |
|---|---|

289.     Regarding the Company's controls and procedures, the 2018 Q3 10-Q provided that:

**Evaluation of Disclosure Controls and Procedures**

As of the end of the third quarter of 2018, we carried out an evaluation, under the supervision and with the participation of management, including Ryder's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Ryder's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934). Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that as of the end of the third quarter of 2018, Ryder's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) were effective.

**Changes in Internal Controls over Financial Reporting**

During the nine months ended September 30, 2018, there were no changes in Ryder's internal control over financial reporting that have materially affected or are reasonably likely to materially affect such internal control over financial reporting Also on October 26, 2018, the Company held a conference call with analysts and investors to discuss third quarter 2018 earnings. During the call, Defendant Sanchez reassured investors that, with respect to the Company's accounting treatment of residual values, the Company "keep[s] the residuals in the middle of the fairway as best we can."

***February 14, 2019 Press Release***

290.     On February 14, 2019, the Company issued a press release announcing its financial and operating results for the fourth quarter of 2018. The press release, which Ryder also filed with the SEC as an Exhibit to a Current Report on Form 8-K, was signed by Defendant Garcia.  The press release and Form 8-K reported the following financial information: (i) GAAP Earnings of $111.3 million; (ii) Comparable Earnings of $121 million; (iii) GAAP EPS from Continuing Operations of $2.05; and (iii) Comparable EPS from Continuing Operations of $1.82.

*February 21, 2019 Form 10-K*

291.   Also on February 21, 2019, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Sanchez, Garcia, Berra, Eck, Hagemann, Hilton, Lundgren, Nieto, Nord, A. Smith, E. Smith, Stockton, and Tookes. Attached to the 2018 10-K were SOX Certifications signed by Defendants Sanchez and Garcia, attesting to the accuracy of financial reporting in the 2018 10-K. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

292.   In the 2018 10-K, the Company announced, *inter alia*, the following financial results for the full fiscal year of 2018:

| Consolidated Condensed Statement of Earnings (in thousands, except per share amounts) | |
|---|---|
| Cost of lease and rentals | $2,566,257 |
| Net gains on vehicles | ($21,739) |
| Earnings from continuing operations before income taxes | $373,861 |
| Net earnings | $273,298 |
| EPS – basic net earning | $5.20 |
| EPS – diluted net earnings | $5.17 |
| Consolidated Condensed Statement of Comprehensive Income (in thousands) | |
| Net earnings | $273,298 |
| Comprehensive income | $170,047 |
| Consolidated Condensed Balance Sheet (in thousands) | |
| Total assets | $13,051,084 |
| Total shareholders' equity | $2,910,327 |
| Operating property and equipment, net of accumulated depreciation | $843,813 |
| Retained earnings | $2,710,696 |
| Consolidated Condensed Statements of Cash Flows (in thousands) | |
| Net earnings | $273,298 |
| Depreciation expense | $1,394,964 |
| Net gains on used vehicle sales | $21,739 |

293. In a section a section titled "Management's Report on Internal Control Over Financial Reporting," the 2018 10-K provided, in relevant part, that:

> Management assessed the effectiveness of Ryder's internal control over financial reporting as of December 31, 2018. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in "Internal Control — Integrated Framework (2013)." Based on our assessment and those criteria, management determined that Ryder maintained effective internal control over financial reporting as of December 31, 2018.

### *March 18, 2019 Proxy Statement*

294. On March 18, 2019, the Company filed a Schedule 14A with the SEC (the "2019 Proxy Statement"). Defendants Eck, Hagemann, Hilton, Lundgren, Nieto, Nord, Sanchez, A. Smith, E. Smith, Stockton, and Tookes solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[3]

295. With respect to the Company's Code of Conduct, the 2019 Proxy Statement stated that it "appl[ies] to our officers, employees and Board members and cover all areas of professional conduct including conflicts of interest, confidentiality, compliance with law and mechanisms to report known or suspected wrongdoing."

296. The Individual Defendants caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price

---

[3] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

297.    The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

298.    The 2019 Proxy Statement also called for shareholder approval of, among other things: (1) the election of eleven directors; (2) ratification of the Company's independent auditors; (3) an advisory vote to approve named executive officer compensation; (4) the 2019 Equity and Incentive Compensation Plan, which, among other things would increase the number of shares of Ryder common stock available to be granted under the Company's equity compensation plan in 2016 by 4,300,000; (5) amendments to the Company's Restated Articles of Incorporation and By-Laws to remove supermajority voting provisions on shareholder action by written consent; and (6) an advisory vote on a shareholder proposal on an independent board chairman.

299.    The 2019 Proxy Statement was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) throughout the Relevant Period, nearly all of Ryder's used vehicles were selling at prices significantly below the residual values that the Company had designated for each vehicle; (2) as a result, Ryder had a large number of vehicles that were recorded at high residual values that needed to be written down because the residual values of the Company's used vehicles had materially decreased and its depreciation expense had materially increased beginning at least as early as mid-2015; (3) the

Company failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense, which resulted in a material overstatement of the Company's net earnings, earnings per share, the value of its operating property and equipment, its total assets, retained earnings, and total shareholder's equity; (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### April 30, 2019 Press Release

300.    On April 30, 2019, the Company issued a press release announcing its financial and operating results for the first quarter of 2019. The press release, which Ryder also filed with the SEC as an Exhibit to a Current Report on Form 8-K, was signed by Defendant Garcia.  The press release and Form 8-K reported the following financial information: (i) GAAP Earnings of $68.2 million; (ii) Comparable Earnings of $80.8 million; (iii) GAAP EPS from Continuing Operations of $0.87; and (iii) Comparable EPS from Continuing Operations of $1.11.

### May 9, 2019 Form 10-Q

301.    On May 9, 2019, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2019 (the "2019 Q1 10-Q"). The 2019 Q1 10-Q was signed by Defendants Sanchez and Garcia. Attached to the 2019 Q1 10-Q were SOX Certifications signed by Defendant Sanchez, attesting to the accuracy of financial reporting in the 2019 Q2 10-Q. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

302.    In the 2019 Q1 10-Q, the Company announced, *inter alia*, the following financial results for the first quarter of 2019:

| Consolidated Condensed Statement of Earnings (in thousands, except per share amounts) | |
|---|---|
| Cost of lease and rentals | $664,289 |
| Net gains on vehicles | $8,217 |
| Earnings from continuing operations before income taxes | $68,151 |
| Net earnings | $45,316 |
| EPS – basic net earning | $0.86 |
| EPS – diluted net earnings | $0.86 |
| Consolidated Condensed Statement of Comprehensive Income (in thousands) | |
| Net earnings | $45,316 |
| Comprehensive income | $66,532 |
| Consolidated Condensed Balance Sheet (in thousands) | |
| Total assets | $13,948,985 |
| Total shareholders' equity | $2,566,804 |
| Operating property and equipment, net of accumulated depreciation | $871,524 |
| Retained earnings | $2,343,857 |
| Consolidated Condensed Statements of Cash Flows (in thousands) | |
| Net earnings | $45,316 |
| Depreciation expense | $377,357 |
| Net gains on used vehicle sales | $8,217 |

303.    Regarding the Company's controls and procedures, the 2019 Q1 10-Q provided that:

**Evaluation of Disclosure Controls and Procedures**

As of the end of the first quarter of 2019, we carried out an evaluation, under the supervision and with the participation of management, including Ryder's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Ryder's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934). Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that as of the end of the first quarter of 2019, Ryder's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) were effective.

**Changes in Internal Controls over Financial Reporting**

. . . . During the three months ended March 31, 2019, there were no other changes in Ryder's internal control over financial reporting that have materially affected or

103

are reasonably likely to materially affect such internal control over financial reporting.

304.     The statements and omissions referenced in ¶¶ 194–216, 218–269, 276–293, and 300–303 were materially false and misleading, and they failed to disclose material facts necessary to make the statements not false and misleading. Specifically, throughout the Relevant Period, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) throughout the Relevant Period, nearly all of Ryder's used vehicles were selling at prices significantly below the residual values that the Company had designated for each vehicle; (2) as a result, Ryder had a large number of vehicles that were recorded at high residual values that needed to be written down because the residual values of the Company's used vehicles had materially decreased and its depreciation expense had materially increased beginning at least as early as mid-2015; (3) the Company failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense, which resulted in a material overstatement of the Company's net earnings, earnings per share, the value of its operating property and equipment, its total assets, retained earnings, and total shareholder's equity; (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Gradually Emerges False and Misleading Statements Continue**

***July 30, 2019 Press Release and Form 10-Q***

305.     On July 30, 2019, the Company issued a press release announcing its financial and operating results for the second quarter of 2019. The press release, which Ryder also filed with the SEC as an Exhibit to a Current Report on Form 8-K, was signed by Defendant Garcia.  The press release and Form 8-K reported the following financial information: (i) GAAP Earnings of $103.1

million; (ii) Comparable Earnings of $101 million; (iii) GAAP EPS from Continuing Operations of $1.43; and (iii) Comparable EPS from Continuing Operations of $1.40.

306.   On the same day, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2019 (the "2019 Q2 10-Q"). The 2019 Q2 10-Q was signed by Defendants Sanchez and Garcia. Attached to the 2019 Q2 10-Q were SOX Certifications signed by Defendants Sanchez and Garcia, attesting to the accuracy of financial reporting in the 2019 Q2 10-Q. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

307.   In the 2019 Q2 10-Q, the Company announced, *inter alia*, the following financial results for the second quarter of 2019 :

| Consolidated Condensed Statement of Earnings (in thousands, except per share amounts) | |
|---|---|
| Cost of lease and rentals | $687,540 |
| Net gains on vehicles | ($18,140) |
| Earnings from continuing operations before income taxes | $103,069 |
| Net earnings | $75,215 |
| EPS – basic net earning | $1.43 |
| EPS – diluted net earnings | $1.43 |
| Consolidated Condensed Statement of Comprehensive Income (in thousands) | |
| Net earnings | $72,215 |
| Comprehensive income | $66,245 |
| Consolidated Condensed Balance Sheet (in thousands) | |
| Total assets | $14,522,054 |
| Total shareholders' equity | $2,607,706 |
| Operating property and equipment, net of accumulated depreciation | $866,908 |
| Retained earnings | $2,385,620 |
| Consolidated Condensed Statements of Cash Flows (in thousands) | |
| Net earnings | $120,531 |
| Depreciation expense | $768,030 |
| Net gains on used vehicle sales | ($26,357) |

308.    The Company also announced that the EBT for the second quarter of 2019 in its FMS business segment was down to $57.7 million, as compared to $72.9 million the prior year period, as a result of lower used vehicle sales results, which had declined from the prior year as a result of higher valuation adjustments of $10.4 million on a larger inventory and higher depreciation of $7.6 million due to residual value changes. Because of this, the Company reduced its earnings per share forecast for 2019 to a range of $4.80 to $5.10, as compared to its previous forecasted range of $5.28 to $5.58. Although the Company did not quantify the impact of used vehicle prices on its 2019 outlook, management indicated that the majority of the lowered guidance reflected weaker tractor valuations.

309.    In response to this news, Ryder's stock price declined 10%, from $59.32 per share on July 29, 2019 to $53.38 per share on July 30, 2019, on unusually high volume of more than 1.4 million shares traded. This share price drop equated to a $323 million drop in market capitalization.

310.    Analysts responded negatively to this news. On the same day, Deutsche Bank wrote an analyst report entitled "Good operating Q[uarter], but used truck prices sting." In it, Deutsche Bank says that "Ryder can't seem to shake the impact of weaker used truck prices, which is something that is taking longer to recover than we had previously expected." J.P. Morgan also reported on the same day that "[v]ersus our model, FMS was weaker than expected, as used vehicle results and higher bad debt weighed on performance, partially offset by a solid topline and operating beat at DTS during the quarter." Similarly, Wolfe Research reported that its 2019 ""EPS estimate was already below the low-end of R's [Ryder's] guidance, but the magnitude of today's cut is worse than we expected."

### October 29, 2019 Press Release and Form 10-Q

311.  On October 29, 2019, the Company issued a press release announcing its financial and operating results for the third quarter of 2019. The press release, which Ryder also filed with the SEC as an Exhibit to a Current Report on Form 8-K, was signed by Defendant Garcia.  The press release and Form 8-K reported the following financial information: (i) GAAP Earnings loss of $91.3 million; (ii) Comparable Earnings loss of $73.0 million; (iii) GAAP EPS loss from Continuing Operations of $1.75; and (iii) Comparable EPS loss from Continuing Operations of $1.49.

312.  On the same day, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2019 (the "2019 Q3 10-Q"). The 2019 Q3 10-Q was signed by Defendants Sanchez and Garcia. Attached to the 2019 Q3 10-Q were SOX Certifications signed by Defendants Sanchez and Garcia, attesting to the accuracy of financial reporting in the 2019 Q3 10-Q. The SOX Certifications further attested that all fraud and any material changes to the Company's internal control over financial reporting had been disclosed.

313.  In the 2019 Q3 10-Q, the Company announced, *inter alia*, the following financial results for the third quarter of 2019 :

| Consolidated Condensed Statement of Earnings (in thousands, except per share amounts) | |
|---|---|
| Cost of lease and rentals | $877,767 |
| Net gains on vehicles | ($22,734) |
| Earnings from continuing operations before income taxes | ($91,260) |
| Net earnings | ($91,455) |
| EPS – basic net earning | ($1.75) |
| EPS – diluted net earnings | ($1.75) |
| Consolidated Condensed Statement of Comprehensive Income (in thousands) | |
| Net earnings | ($91,455) |
| Comprehensive income | ($107,221) |

| Consolidated Condensed Balance Sheet (in thousands) | |
|---|---|
| Total assets | $14,482,844 |
| Total shareholders' equity | $2,476,987 |
| Operating property and equipment, net of accumulated depreciation | $891,689 |
| Retained earnings | $2,262,356 |
| Consolidated Condensed Statements of Cash Flows (in thousands) | |
| Net earnings | $29,076 |
| Depreciation expense | $1,342,746 |
| Net gains on used vehicle sales | ($49,091) |

314. Moreover, the Individual Defendants caused the Company to disclose that the Company was finally significantly reducing its residual value estimates. The Defendants disclosed to investors that "management concluded that our residual value estimates likely exceeded the expected future values that would be realized upon the sale of power vehicles in our fleet." On the same day, during a conference call with analysts and investors, Defendant Sanchez admitted that, "[f]ollowing the mid-2015 peak [in used tractor prices], tractor proceeds declined sharply through 2017 to below our accounting residuals as supply entered the market and the freight environment slowed."

315. Therefore, the Company significantly lowered the residual value estimates for all vehicles and incurred $177 million in addition depreciation expenses in the third quarter of 2019. The Company also reduced its residual value estimates for the second half of 2019 by $289 million and for 2020 by $250 million. In total, the Company reduced its residual values by $844 million for the second half of 2019 through 2024-25, as reflected in the below slide from the Company's October 29, 2019 investor presentation:



316.	The Company also reported a third quarter 2019 adjusted loss of ($1.49) that was well below the consensus of $1.49 and the guidance range of $1.45-$.160, which was primarily driven by the increase in depreciation expense.

317.	The SunTrust Robinson Humphrey summarized the impact as follows: "The total impact of the revised residual values as reflected in higher depreciation expense is estimated to be $289M or $3.96/share in 2H19 and $250M or $3.50/share in 2020 . . . . Overall this change results in earlier recognition of depreciation in 2019 and 2020 that would have been recognized in 2021 or later years under its prior estimate."

318.	Analysts were appalled by the Company's disclosure. On October 30, 2019, J.P. Morgan reported that the Company's disclosures confirmed that it "was over-earning by a significant amount in prior years based on the $844mm cumulative write-down." Similarly,

analysts at Wolfe Research wrote that despite the fact that "expectations were low hearing into the report . . . the impact on 3D was much bigger than expected and C20 estimates need to come down materially."

319.    In response to the October 29, 2019 disclosure, the Company's stock price fell by more than 12% over two trading days, from a closing price of $55.12 per share on October 28, 2019 to a closing price of $52.12 on October 29, 2019 and $48.44 per share on October 30, 2019, on unusually high trading volume of more than 2 million shares on October 29, 2019 and more than 1.4 million shares on October 30, 2019.

320.    The statements and omissions referenced in ¶¶ 305–307 and 311–313 were materially false and misleading, and they failed to disclose material facts necessary to make the statements not false and misleading. Specifically, throughout the Relevant Period, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) throughout the Relevant Period, nearly all of Ryder's used vehicles were selling at prices significantly below the residual values that the Company had designated for each vehicle; (2) as a result, Ryder had a large number of vehicles that were recorded at high residual values that needed to be written down because the residual values of the Company's used vehicles had materially decreased and its depreciation expense had materially increased beginning at least as early as mid-2015; (3) the Company failed to correctly and fully reduce the residual values of its fleet vehicles or increase its depreciation expense, which resulted in a material overstatement of the Company's net earnings, earnings per share, the value of its operating property and equipment, its total assets, retained earnings, and total shareholder's equity; (4) the Company failed to maintain internal controls. As a result of the

foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Full Truth Emerges**

321.    On February 13, 2020, the truth about the Company's overstated residual values fully emerged when the Company disclosed that, as a result of the significant reductions to the residual value of its fleet, the Company had incurred a total of $357 million in depreciation expense for 2019, plus a loss of approximately $58 million on the sale of used vehicles. The Company also announced that, for 2020, it expected to incur another $275 million in depreciation expense on its fleet due to the reductions in residual value plus an additional $20 million estimated loss on used vehicle sales.

322.    In response to this disclosure, the Company's stock price fell dramatically by 23% over three trading days, from a closing price of $50.19 per share on February 12, 2020, to a closing price  of $45.01 on February 13, 2020, to a closing price of $40.12 on February 14, 2020, and a closing price of $38.45 on February 18, 2020—all on unusually high trading volume.

323.    Analysts reacted harshly to this news.  For example, Pacific Square Research stated that the Company was "paying the price for years of underpricing its leases to drive growth" with a depreciation methodology that had "Gone Awry" and "introduce[d] a significant distortion into earnings. Pacific Square Research went on to state that "[w]hat is shocking to us is that Ryder continued to adjust residual values and depreciable lives upward from 2011-2016 as if management assumed the good times would never end."

324.    A few months later, Pacific Square Research similarly wrote that " [t]he Company blames a continuing, unexpected and seemingly impossible-to-predict decline in the selling prices

for used equipment . . . [t]he trouble is, repeatedly raising residual values—as Ryder did from 2011-2019—is just another form of borrowing from the future.  In our view, it represents a cosmetic boost that benefits earnings in the short term, at the expense of future earnings."

### **Repurchases During the Relevant Period**

325.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company.  In total, during the Relevant Period, the Company spent an aggregate amount of over $201.3 million to repurchase approximately 3.1 million shares of its own common stock at artificially inflated prices.

326.    According to the 2015 Q3 10-Q, during August 1, 2015 through September 30, 2015, the Company purchased 222 shares of its common stock for approximately $18,272.82, at an average price of $82.31 per share.

327.    As the Company's stock was actually worth only $38.45 per share, the price at closing on February 18, 2020, the amount the Company overpaid for repurchases of its own stock during September 2015 was approximately $9,736.92.

328.    According to the 2015 10-K, during the quarterly period ended December 31, 2015, the Company purchased 822 shares of its common stock for approximately $47,930.82, at an average price of $58.31 per share.

329.    As the Company's stock was actually worth only $38.45 per share, the price at closing on February 18, 2020, the amount the Company overpaid for repurchases of its own stock during the quarterly period ended December 31, 2015 was approximately $16,324.92.

330.    According to the 2016 Q1 10-Q, during the quarterly period ended March 31, 2016, the Company purchased 30,552 shares of its common stock for approximately $1,713,356.16, at an average price of $56.08 per share.

331.    As the Company's stock was actually worth only $38.45 per share, the price at closing on February 18, 2020, the amount the Company overpaid for repurchases of its own stock during the quarterly period ended March 31, 2016 was approximately $538,631.76.

332.    According to the 2016 Q2 10-Q, during the quarterly period ended June 30, 2016, the Company purchased 322,341 shares of its common stock for approximately $21,932,081.64, at an average price of $68.04 per share.

333.    As the Company's stock was actually worth only $38.45 per share, the price at closing on February 18, 2020, the amount the Company overpaid for repurchases of its own stock during the quarterly period ended June 30, 2016 was approximately $9,538,070.19.

334.    According to the 2016 Q3 10-Q, during the quarterly period ended September 30, 2016, the Company purchased 60,261 shares of its common stock for approximately $3,897,681.48, at an average price of $64.68 per share.

335.    As the Company's stock was actually worth only $38.45 per share, the price at closing on February 18, 2020, the amount the Company overpaid for repurchases of its own stock during the quarterly period ended September 30, 2016 was approximately $1,580,646.03.

336.    According to the 2016 10-K, during the quarterly period ended December 31, 2016, the Company purchased 156,927 shares of its common stock for approximately $11,650,260.48, at an average price of $74.24 per share.

337.    As the Company's stock was actually worth only $38.45 per share, the price at closing on February 18, 2020, the amount the Company overpaid for repurchases of its own stock during the quarterly period ended December 31, 2016 was approximately $5,616,417.33.

338.    According to the 2017 Q1 10-Q, during the quarterly period ended March 31, 2017, the Company purchased 245,705 shares of its common stock for approximately $18,698,150.50, at an average price of $76.10 per share.

339.    As the Company's stock was actually worth only $38.45 per share, the price at closing on February 18, 2020, the amount the Company overpaid for repurchases of its own stock during the quarterly period ended March 31, 2017 was approximately $9,250,793.25.

340.    According to the 2017 Q2 10-Q, during the quarterly period ended June 30, 2017, the Company purchased 621,475 shares of its common stock for approximately $42,365,950.75, at an average price of $68.17 per share.

341.    As the Company's stock was actually worth only $38.45 per share, the price at closing on February 18, 2020, the amount the Company overpaid for repurchases of its own stock during the quarterly period ended June 30, 2017 was approximately $18,470,237.00.

342.    According to the 2017 Q3 10-Q, during the quarterly period ended September 30, 2017, the Company purchased 114,186 shares of its common stock for approximately $8,267,066.40, at an average price of $72.40 per share.

343.    As the Company's stock was actually worth only $38.45 per share, the price at closing on February 18, 2020, the amount the Company overpaid for repurchases of its own stock during the quarterly period ended September 30, 2017 was approximately $3,876,614.70.

344.     According to the 2017 10-K, during the quarterly period ended December 31, 2017, the Company purchased 154,704 shares of its common stock for approximately $12,521,741.76, at an average price of $80.94 per share.

345.     As the Company's stock was actually worth only $38.45 per share, the price at closing on February 18, 2020, the amount the Company overpaid for repurchases of its own stock during the quarterly period ended December 31, 2017 was approximately $6,573,372.96.

346.     According to the Company's quarterly report on Form 10-Q filed with the SEC on May 2, 2018, during the quarterly period ended March 31, 2018, the Company purchased 197,257 shares of its common stock for approximately $15,042,818.82, at an average price of $76.26 per share.

347.     As the Company's stock was actually worth only $38.45 per share, the price at closing on February 18, 2020, the amount the Company overpaid for repurchases of its own stock during the quarterly period ended March 31, 2018 was approximately $7,458,287.17.

348.     According to the 2018 Q2 10-Q, during the quarterly period ended June 30, 2018, the Company purchased 63,853 shares of its common stock for approximately $4,352,220.48, at an average price of $68.16 per share.

349.     As the Company's stock was actually worth only $38.45 per share, the price at closing on February 18, 2020, the amount the Company overpaid for repurchases of its own stock during the quarterly period ended June 30, 2018 was approximately $1,897,072.63.

350.     According to the Company's quarterly report on Form 10-Q filed with the SEC on October 26, 2018, during the quarterly period ended September 30, 2018, the Company purchased

134,903 shares of its common stock for approximately $10,498,151.46, at an average price of $77.82 per share.

351.    As the Company's stock was actually worth only $38.45 per share, the price at closing on February 18, 2020, the amount the Company overpaid for repurchases of its own stock during the quarterly period ended September 30, 2018 was approximately $5,311,131.11.

352.    According to the 2018 10-K, during the quarterly period ended December 31, 2018, the Company purchased 56,613 shares of its common stock for approximately $3,161,836.05, at an average price of $55.85 per share.

353.    As the Company's stock was actually worth only $38.45 per share, the price at closing on February 18, 2020, the amount the Company overpaid for repurchases of its own stock during the quarterly period ended December 31, 2018 was approximately $985,066.20.

354.    According to the 2019 Q2 10-Q, during the quarterly period ended March 31, 2019, the Company purchased 284,176 shares of its common stock for approximately $17,601,861.44, at an average price of $61.94 per share.

355.    As the Company's stock was actually worth only $38.45 per share, the price at closing on February 18, 2020, the amount the Company overpaid for repurchases of its own stock during the quarterly period ended March 31, 2019 was approximately $6,675,294.24.

356.    According to the Q2 2019 10-Q, during the quarterly period ended June 30, 2019, the Company purchased 120,908 shares of its common stock for approximately $7,161,380.84, at an average price of $59.23 per share.

357.     As the Company's stock was actually worth only $38.45 per share, the price at closing on February 18, 2020, the amount the Company overpaid for repurchases of its own stock during the quarterly period ended June 30, 2019 was approximately $2,512,468.24.

358.     According to the Q3 2019 10-Q, during the quarterly period ended September 30, 2019, the Company purchased 62,906 shares of its common stock for approximately $3,216,383.78, at an average price of $51.13 per share.

359.     As the Company's stock was actually worth only $38.45 per share, the price at closing on February 18, 2020, the amount the Company overpaid for repurchases of its own stock during the quarterly period ended September 30, 2019 was approximately $797,648.08.

360.     According to the 2019 10-K, during the quarterly period ended December 31, 2019, the Company purchased 64,242 shares of its common stock for approximately $3,291,760.08, at an average price of $51.24 per share.

361.     As the Company's stock was actually worth only $38.45 per share, the price at closing on February 18, 2020, the amount the Company overpaid for repurchases of its own stock during the quarterly period ended December 31, 2019 was approximately $821,655.18.

362.     According to the Company's Form 10-Q filed with the SEC on May 1, 2020, between February 1, 2020 and February 29, 2020, the Individual Defendants caused the Company to repurchase 384,724 shares of its own common stock at an average price per share of approximately $41.30, for a total cost to the Company of approximately $15,889,101.2. Upon information and belief, at least some of these repurchases were made while the price of the Company's shares was artificially inflated due to the false and misleading statements discussed herein.

363.     As the Company's stock was actually worth only $38.45 per share, the price at closing on February 18, 2020, the amount the Company overpaid for repurchases of its own stock during February 2020 was approximately $1,032,636.4.

364.     Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by approximately $83 million.

## DAMAGES TO RYDER

365.     As a direct and proximate result of the Individual Defendants' conduct, Ryder has lost and expended, and will continue losing and expending, many millions of dollars.

366.     Such expenditures include, but are not limited to, legal fees and payments associated with the Securities Class Action filed against the Company, its CEO and Chairman of the Board, its former CFO, and its former President of the Global FMS segment, and any internal investigations and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

367.     Such losses include the Company's overpayment by approximately $83 million for repurchases of its own stock during the Relevant Period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

368.     Such costs include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

369.     As a direct and proximate result of the Individual Defendants' conduct, Ryder has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties.

118

## DERIVATIVE ALLEGATIONS

370.    Plaintiff brings this action derivatively and for the benefit of Ryder to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Ryder, violations of the Exchange Act as well as the aiding and abetting thereof.

371.    Ryder is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

372.    Plaintiff is, and has been at all relevant times, a Ryder shareholder. Plaintiff will adequately and fairly represent the interests of Ryder in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

373.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

374.    A pre-suit demand on the Board of Ryder is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eleven individuals, Individual Defendants Sanchez, Eck, Hagemann, Hilton, Lundgren, Nieto, Nord, A. Smith, E. Smith, Stockton, and Tookes (the "Directors"). Plaintiff only needs to allege demand futility as to six of the eleven Directors who are on the Board at the time of the filing of this complaint.

375.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to engage in improper accounting practices and to make false and misleading statements and omissions of material facts,

while three of them engaged in insider sales based on material non-public information, and, at the same time, caused the Company to overpay by approximately $83 million for repurchases of its own stock, all of which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

376.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated causing the Company to engage in improper accounting practices and in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to inflate earnings and make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

377.    Additional reasons that demand on Defendant Sanchez is futile follow. Defendant Sanchez has served as the Company's CEO since January 2013, and as Chairman of the Board since May 2013. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Sanchez with his principal occupation, and he receives handsome compensation as described above, including $6,604,851 during the fiscal year ended December 31, 2019. A majority of Defendant Sanchez's compensation was performance-based and tied to the overall success of the Company—and his cash incentive was determined based on the Company's comparable earnings per and Operating Revenue. In fact, for the fiscal year ended December 31, 2019, Defendant Sanchez received 3,897,431 in compensation-based stock awards. Therefore, Defendant Sanchez's statements regarding residual values directly and indirectly affected his compensation during the Relevant Period.

378. Defendant Sanchez's insider sales, which yielded at least $6.6 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Sanchez was ultimately responsible for all of the false and misleading statements and omissions that were made, including those made during conference calls and contained in the Company's SEC filings and press releases referenced herein, many of which he either personally made or signed off on. As the Company's highest officer during the Relevant Period and as a trusted director, Defendant Sanchez conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Sanchez is a defendant in the Securities Class Action. Thus, for these reasons, too, Defendant Sanchez breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

379. Additional reasons that demand on Defendant Eck is futile follow. Defendant Eck has served as a Company director since March 2007. He also serves as a member of the Compensation Committee and Corporate Governance and Nominating Committee. Previously, he served as a member of the Finance Committee. Defendant Eck has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Eck signed, and thus

personally made the false and misleading statements in the 2015 10-K, 2016 10-K, 2017 10-K, and 2018 10-K. For these reasons, too, Defendant Eck breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

380.    Additional reasons that demand on Defendant Hagemann is futile follow. Defendant Hagemann has served as a Company director since August 2014. He also serves as a member of the Audit Committee and the Finance Committee. Defendant Hagemann has received and continues to receive compensation for his role as a director as described herein.  As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Hagemann signed, and thus personally made the false and misleading statements in the 2015 10-K, 2016 10-K, 2017 10-K, and 2018 10-K. For these reasons, too, Defendant Hagemann breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

381.    Additional reasons that demand on Defendant Hilton is futile follow. Defendant Hilton has served as a Company director since July 2012. He also serves as a member of the Compensation Committee and Corporate Governance and Nominating Committee. Defendant Hilton has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading

statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Hilton signed, and thus personally made the false and misleading statements in the 2015 10-K, 2016 10-K, 2017 10-K, and 2018 10-K. For these reasons, too, Defendant Hilton breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

382.    Additional reasons that demand on Defendant Lundgren is futile follow. Defendant Lundgren has served as a Company director since October 2012. She also serves as a member of the Audit Committee and Corporate Governance and Nominating Committee. Defendant Lundgren has received and continues to receive compensation for her role as a director as described herein.  As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Lundgren signed, and thus personally made the false and misleading statements in the 2015 10-K, 2016 10-K, 2017 10-K, and 2018 10-K. For these reasons, too, Defendant Lundgren breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

383.    Additional reasons that demand on Defendant Nieto is futile follow. Defendant Nieto has served as a Company director since February 2007. He also serves as a member of the Audit Committee and the Finance Committee. Defendant Nieto has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director,

he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Defendant Nieto's insider sales, which yielded at least $242,196 in proceeds, demonstrate his motive in facilitating and participating in the fraud. Furthermore, Defendant Nieto signed, and thus personally made the false and misleading statements in the 2015 10-K, 2016 10-K, 2017 10-K, and 2018 10-K. For these reasons, too, Defendant Nieto breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

384.    Additional reasons that demand on Defendant Nord is futile follow. Defendant Nord has served as a Company director since March 2018. He also serves as the Chair of the Audit Committee and as a member of the Finance Committee. Defendant Nord has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Nord signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, too, Defendant Nord breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

385.     Additional reasons that demand on Defendant A. Smith is futile follow.  Defendant A. Smith has served as a Company director since July 2003. She also serves as the Chair of the Finance Committee and as a member of the Audit Committee. Defendant A. Smith has received and continues to receive compensation for her role as a director as described herein. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant A. Smith signed, and thus personally made the false and misleading statements in the 2015 10-K, 2016 10-K, 2017 10-K, and 2018 10-K. For these reasons, too, Defendant A. Smith breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

386.     Additional reasons that demand on Defendant E. Smith is futile follow. Defendant E. Smith has served as a Company director since July 2005. She also serves as the Chair of the Compensation Committee and as a member of the Corporate Governance and Nominating Committee. Defendant E. Smith has received and continues to receive compensation for her role as a director as described herein. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant E. Smith's insider sales, which yielded at least $139,078 in proceeds, demonstrate her motive in facilitating and participating in the fraud. Furthermore, Defendant E.

125

Smith signed, and thus personally made the false and misleading statements in the 2015 10-K, 2016 10-K, 2017 10-K, and 2018 10-K. For these reasons, too, Defendant E. Smith breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

387.    Additional reasons that demand on Defendant Stockton is futile follow. Defendant Stockton has served as a Company director since March 2018. He also serves as a member of the Compensation Committee and Finance Committee. Defendant Stockton has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Stockton signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, too, Defendant Stockton breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

388.    Additional reasons that demand on Defendant Tookes is futile follow. Defendant Tookes has served as a Company director since September 2002. He also serves as the Chair of the Corporate Governance and Nominating Committee and as a member of the Audit Committee. Defendant Tookes has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and

126

misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Tookes signed, and thus personally made the false and misleading statements in the 2015 10-K, 2016 10-K, 2017 10-K, and 2018 10-K. For these reasons, too, Defendant Tookes breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

389.    Additional Reasons that demand on the Board is futile follow.

390.    Each of the Directors, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of unnecessary and harmful repurchases that caused the Company to overpay by millions of dollars for its own common stock during the Relevant Period. The Directors, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

391.    Defendants Hagemann, Lundgren, Nord, A. Smith, and Tookes (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the Company's accounting and financial reporting processes, the Company's significant risk exposures, and the Company's compliance with legal and regulatory requirements. The Audit Committee Defendants failed to ensure the integrity of the Company's accounting and financial reporting processes, as they are charged to do under the Audit Committee Charter, allowing the Company to cause the Company to engage in improper

accounting practices, to file false and misleading financial statements with the SEC, and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

392.   As described above, at least three of the Directors directly engaged in insider trading, in violation of federal law and the Company's Code of Conduct. Defendant Sanchez received proceeds of approximately $6.6 million, Defendant Nieto received proceeds of approximately $242,196, and Defendant E. Smith received approximately $139,078 as a result of insider transactions executed during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and excused.

393.   The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

394.   In violation of the Company's Code of Conduct and the Guidelines, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting, and of the Company's engagement in the Individual Defendants' scheme to cause the Company to engage in improper accounting practices and to cause the Company to engage in improper accounting practices, to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust

enrichment, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Conduct and the Guidelines, the Directors engaged in improper insider selling, failed to comply with laws and regulations, maintain the accuracy of Company records, public reports and communications, and uphold the responsibilities related thereto. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

395.    Ryder has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Ryder any part of the damages Ryder suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

396.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

397.    The acts complained of herein constitute violations of fiduciary duties owed by Ryder officers and directors, and these acts are incapable of ratification.

398.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability

insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Ryder. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Ryder, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

399.    If there is no directors' and officers' liability insurance, then the Directors will not cause Ryder to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

400.    Thus, for all the reasons set forth above, all of the Directors, and, if not all of them, at least six of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934**

401.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

402.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf

of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

403.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

404.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

405.    Under the direction and watch of the Directors, the 2018 and 2019 Proxy Statements (the "Proxy Statements") failed to disclose that: (1) throughout the Relevant Period, nearly all of Ryder's used vehicles were selling at prices significantly below the residual values that the Company had designated for each vehicle; (2) as a result, Ryder had a large number of vehicles that were recorded at high residual values that needed to be written down because the residual values of the Company's used vehicles had materially decreased and its depreciation

expense had materially increased beginning at least as early as mid-2015; (3) the Company failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense, which resulted in a material overstatement of the Company's net earnings, earnings per share, the value of its operating property and equipment, its total assets, retained earnings, and total shareholder's equity; (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

406.    The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

407.    Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them and their engagement in the scheme to cause the Company to engage in improper accounting practices and to issue false and misleading statements and omissions of material fact.

408.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination

132

in the Proxy Statements, including, but not limited to, the election of directors, ratification of the Company's independent auditor, advisory approval of the compensation of executive officers, approval of amendments to the Company's Restated Articles of Incorporation and By-Laws to authorize shareholder action by written consent, approval of shareholder proposal on simple majority voting, management proposal to approve the Equity and Incentive Compensation Plan, management proposal to remove supermajority voting provisions for shareholder action by written consent, and advisory vote on shareholder proposal on an Independent Board Chairman.

409.    The false and misleading elements of the Proxy Statements alleged herein were material to shareholders and led to the re-election of Defendants Sanchez, Eck, Hagemann, Hilton, Lundgren, Nieto, Nord, A. Smith, E. Smith, Stockton, and Tookes, which allowed them to continue breaching their fiduciary duties to Ryder. Had shareholders been informed that the Individual Defendants caused the Company to engage in improper accounting practices and issue false and misleading statements, as detailed herein, Ryder shareholders would not have approved the election of Defendants Berra, Eck, Hagemann, Hilton, Lundgren, Nieto, Nord, Sanchez, A. Smith, E. Smith, Stockton, and Tookes; would not have ratified the independent accounting firm; would not have approved the compensation of the executive officers; would not have approved the Equity and Incentive Compensation Plan, and would not have approved amendments to the Articles of Incorporation and By-Laws to change the voting requirement for the removal of directors, to change the voting requirement for amendments to the By-Laws, to change voting requirements for amendments to the Articles, or to change the general voting requirements.

410.    The Company was damaged as a result of the Individual Defendants material misrepresentations and omissions in the Proxy Statements.

411.    Plaintiff on behalf of Ryder has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Violations of
### Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

412.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

413.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Ryder. Not only is Ryder now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Ryder by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices during the Relevant Period due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially-inflated prices, damaging Ryder.

414.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

415.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue

and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Ryder not misleading.

416.     The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Ryder. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

417.     In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, they made and/or signed the Company's Form 10-Ks filed with the SEC during the Relevant Period.

418.     By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

419.     Plaintiff on behalf of Ryder has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Violations of Section 20(a) of the of the Securities Exchange Act of 1934

420.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

421.     The Individual Defendants, by virtue of their positions with Ryder and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Ryder and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Ryder and the other Individual Defendants to engage in the illegal conduct and practices complained of herein and violate § 10(b) of the Exchange Act.

422.     Plaintiff on behalf of Ryder has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

423.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

424.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Ryder's business and affairs.

425.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

426.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein.   The

Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Ryder.

427.    In breach of their fiduciary duties to Ryder, the Individual Defendants also willfully or recklessly made and/or caused the Company to engage in improper accounting practices and to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) throughout the Relevant Period, nearly all of Ryder's used vehicles were selling at prices significantly below the residual values that the Company had designated for each vehicle; (2) as a result, Ryder had a large number of vehicles that were recorded at high residual values that needed to be written down because the residual values of the Company's used vehicles had materially decreased and its depreciation expense had materially increased beginning at least as early as mid-2015; (3) the Company failed to correctly reduce the residual values of its fleet vehicles or increase its depreciation expense, which resulted in a material overstatement of the Company's net earnings, earnings per share, the value of its operating property and equipment, its total assets, retained earnings, and total shareholder's equity; (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

428.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

429.   In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

430.   The Individual Defendants also breached their fiduciary duties by causing the Company to repurchase millions of shares of its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while at least six of the Individual Defendants engaged in lucrative insider sales, netting proceeds of over $11.5 million.

431.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

432.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed

knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

433.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

434.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Ryder has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

435.    Plaintiff on behalf of Ryder has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

436.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

437.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Ryder.

438.    The Individual Defendants either benefited financially from the improper conduct and their engaging in lucrative insider transactions tied to false and misleading statements, or received, unjustly, lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Ryder that was tied to the performance or

artificially inflated valuation of Ryder, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

439.    Plaintiff, as a shareholder and representative of Ryder, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

440.    Plaintiff on behalf of Ryder has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

441.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

442.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Ryder to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products and/or services. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

443.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

444.    Plaintiff on behalf of Ryder has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all of the Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Ryder, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that each of the Individual Defendants breached or aided and abetted the breach of their fiduciary duties to Ryder;

(c)     Determining and awarding to Ryder the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Ryder and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Ryder and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Ryder to nominate at least six candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance

with applicable laws, rules, and regulations;

(e) Awarding Ryder restitution from the Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 19, 2021

Respectfully submitted,

**THE ROSEN LAW FIRM, P.C.**

/s/ Laurence M. Rosen
Laurence M. Rosen (Fla. Bar No.: 0182877)
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: lrosen@rosenlegal.com
       pkim@rosenlegal.com

Timothy W. Brown
**THE BROWN LAW FIRM, P.C.**
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I, Alan Campbell am a plaintiff in the within action. I have reviewed the allegations made in this verified consolidated shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2021.

1/12/2021

Alan Campbell
_____
Alan Campbell